```
 1                  UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF VIRGINIA
 2                     Charlottesville Division

 3
    JAMES KLEMIC, et al.,          Civil No. 3:1400041
 4
                      Plaintiffs,
 5
                 vs.               Harrisonburg, Virginia
 6
    DOMINION TRANSMISSION, INC.,
 7
                      Defendant,
 8
    COMMONWEALTH OF VIRGINIA,
 9
                      Intervenor.   February 5, 2015
10
                   TRANSCRIPT OF MOTIONS HEARING
11           BEFORE THE HONORABLE MICHAEL F. URBANSKI
                   UNITED STATES DISTRICT JUDGE
12
    APPEARANCES:
13
    For the Plfs.:
14
                                   Scott Kroner, PLC
                                   NEAL L. WALTERS
15                                 P.O. Box 2737
                                   Charlottesville, VA 22902
16
    For the Defendant:
17
                                   McGuire Woods LLP
                                   JOHN D. WILBURN
18                                 1750 Tysons Corner
                                   Tysons Corner, VA  22102
19  For the Intervenor:

20                                 Office of Atty General
                                   STUART A. RAPHAEL
21                                 900 E. Main St.
                                   Richmond, VA 23219
22
    Court Reporter:                Sonia R. Ferris, RPR
23                                 U.S. Court Reporter
                                   116 N. Main St.  Room 314
24                                 Harrisonburg, VA 22802

25  Proceedings recorded by mechanical stenography;
    transcript produced by computer.
```

1             THE COURT:  Good morning.

2             Please call the case.

3             THE CLERK:  Yes, Your Honor.

4             This is Civil Action No. 3:14cv00041, James

5    Klemic, et al., versus Dominion Transmission, Inc.

6             THE COURT:  Good morning.

7             This case has been set down for argument on

8    motion to dismiss; also the motion to intervene.

9             I'm going to grant the motion to intervene

10   and allow the Commonwealth to intervene, given the

11   challenge to the constitutionality of 56-49.01 of the

12   Virginia Code.

13            Back in chambers, we talked about the

14   mechanics of how we were going to organize the arguments

15   this morning.  Counsel agreed that the movant on this

16   motion to dismiss, Dominion Transmission, will go first;

17   followed by the Commonwealth of Virginia, the Attorney

18   General's office; then followed by the response from the

19   plaintiffs in this case.  As I indicated back in

20   chambers, I'll give either side a full opportunity to

21   add whatever it is you want here this morning.

22            As I indicated back in chambers, I intend to

23   write a written opinion on this issue, although as I

24   indicated to you all as well, I have read all the briefs

25   and I have studied -- read, I would say, virtually all

1    of the key cases involved in this issue.

2              So, let's hear first from the movant, and

3    that would be Dominion Transmission, I believe.

4              MR. WILBURN:  Yes, Your Honor.

5              May it please the Court, my name is John

6    Wilburn.  I represent Dominion Transmission, Inc., in

7    this matter and it comes on our motion to dismiss.

8              Your Honor, the issue before the Court I

9    won't suggest is a novel issue. It's an issue that's

10   been addressed by at least 25 states in 60 to 70

11   opinions. As the Court is aware, there's not a recent

12   opinion or at least a Virginia recent opinion on the

13   issue before the Court, which put simply, is whether the

14   entry for survey statute, 56-49.01, is either facially

15   unconstitutional or unconstitutional as applied.

16             THE COURT:  Now, there has not been a

17   Virginia Court that has addressed this Virginia statute.

18             MR. WILBURN:  That's correct, Your Honor.

19             THE COURT:  Similar statutes have been --

20   similar statutes have survived these kinds of challenges

21   in many other states.

22             MR. WILBURN:  In every other state, Your

23   Honor.

24             THE COURT:  Is there a case that you're

25   aware of in the United States of America where a statute

```
 1   similar to this, which is the entry for survey statute,

 2   has ever been declared unconstitutional?

 3               MR. WILBURN:  There is not, Your Honor.

 4   We've looked at the case law on the issue and as far as

 5   we can find, it's about 68 to 0 in terms of

 6   constitutional decisions on this.  In every circumstance

 7   where an entry for survey statute has been challenged

 8   and litigated and opinion come out of that challenge,

 9   the Court has found it to be constitutional.

10               THE COURT:  And most of those cases are

11   Fifth Amendment cases; some Fourteenth Amendment,

12   procedural due process cases.  Maybe a few touch on

13   Fourth Amendment issues.

14               MR. WILBURN:  Predominantly Fifth Amendment.

15   There are a couple of due process.  Typically, you don't

16   see due process because the majority of states that

17   enact these statutes have built into the statute some

18   mechanism for recovery of damages which precludes a due

19   process challenge.

20               THE COURT:  And there's -- it's built into

21   the statute, too.

22               MR. WILBURN:  It's built into the statute in

23   subpart B and it's built into 801-184.

24               But, Your Honor, to answer Your Honor's

25   question, the majority of Fifth Amendment takings
```

1      claims, there's a small subset of statutes where there's

2      a due process challenge where there wasn't a damage

3      remedy built into the statutory scheme.  I think there

4      were one or two that were Fourth Amendment, but that

5      analysis hasn't any gained traction either.

6                 THE COURT:  Mr. Wilburn, I understand your

7      argument.  For me to rule for the plaintiffs in this

8      case and say that this entry for survey statute is

9      unconstitutional would be to contravene a significant

10     body of case law from around the country.

11                MR. WILBURN:  There's about 200 years of

12     jurisprudence that the Court would need to contravene.

13     This statute hasn't been specifically addressed, this

14     particular statute, 56-49.01, but other similar statutes

15     have and the concept is embedded in our common law. The

16     Attorney General's office cited a case that doesn't deal

17     with our statute, but which touches on the common law

18     application of the same issue.  That's the S&W Railroad

19     Company decision at 104 Virginia 323.  That's a 1905

20     decision.  But in that case --

21                THE COURT:  These decisions upholding the

22     right of a utility to go in and just to do the survey,

23     they go back to the early parts of the 19th century.

24     There's an 1830 case out of the Second Circuit that says

25     the common law allows folks to go in and do a survey.

1   They're not -- they're just going in temporarily to do a

2   survey.

3               MR. WILBURN:  That's correct.

4               There's a U.S. Supreme Court decision that

5   goes back to 1984, which is the earliest statement we're

6   able to find, but there are cases that go back in other

7   jurisdictions even before that. You're correct.

8               The fundamental problem in all of the four

9   claims that have been asserted by the landowners is that

10  they presuppose the existence of property rights, and

11  the Supreme Court and every Court that's looked at the

12  issue has rejected to find, and that is that a landowner

13  possesses a property right that allows them to exclude

14  all others in all circumstances until there's a

15  condemnation --

16              THE COURT:  Why shouldn't they be able to

17  keep people off their property? It's their property.

18              MR. WILBURN:  They can keep people off their

19  property subject to certain privileges and exceptions

20  that are well codified in the statutes and recognized in

21  our jurisprudence, going back to the founding of the

22  country.  Examples of that include fire and safety,

23  police officers coming on, emergency needs. But

24  principle among those --

25              THE COURT:  The plaintiffs argue, well, this

 1    isn't a fire and safety issue.  This isn't a police

 2    issue.  This is somebody trying to make money by putting

 3    a pipeline on my property.

 4            MR. WILBURN:  That's the argument, but the

 5    argument sort of misses the point, which is the United

 6    States Supreme Court and every Court that's looked at

 7    this issue has held that a landowner doesn't have an

 8    unfettered right to exclude all others. It just doesn't

 9    exist.  You certainly have a right to compensation if

10    there's going to be --

11            THE COURT:  You have a Fourth Amendment

12    right against unreasonable searches and seizures of your

13    home.

14            MR. WILBURN:  That's correct.  But the two

15    critical words there are both unreasonable and seizure.

16    There's no case that's found that a temporary survey is

17    a seizure of a property right --

18            THE COURT:  There are cases that say -- like

19    the gun case. I forget the name of that case.  I think

20    it was -- may have been a Fourth Circuit case. That's

21    United States vs. Gray, Sixth Circuit, 1973. It's a case

22    in which, as I recall, there was a search warrant to go

23    into the house for alcohol.  The guy was unlawfully

24    selling beer, I think, at a store down below and there

25    was a search warrant to go in and then when the police

 1   were searching the place, they find some rifles.  The

 2   officer in that case takes the rifles from a closet,

 3   carries them to the ground floor of the building where

 4   he copies down the serial numbers.

 5          The Sixth Circuit in that case says even

 6   though that's temporary, it was a seizure of the serial

 7   numbers because the guns were stolen and the guy was

 8   charged with a federal firearms violation. So, even

 9   though that was temporary in that case, the Court said

10   that was a seizure and the Sixth Circuit in that case

11   cites another case -- and I don't have the cite written

12   down -- about air-conditioners, in which there were

13   serial numbers on the air-conditioners. But, you know

14   the seizure in that case the way I read Gray and the way

15   I read that other case is it was a seizure of the serial

16   numbers.  The search warrant didn't authorize them to go

17   in and take those serial numbers.  That case seems to

18   suggest even a temporary going into the property might

19   give rise to a -- might give rise to a Fourth Amendment

20   claim.

21          What do you think about that Gray case?

22          MR. WILBURN:  It gives rise to a claim in

23   that case, but the difference is one of the search was

24   not authorized. So the entering of the property was

25   authorized for a particular purpose, but not for the

1    purpose ultimately utilized by law enforcement, and the

2    Court relied on that fact.

3                THE COURT:  One of the things, too, in the

4    Gray case, the case does not assess the issue in the

5    Fourth Amendment, the critical issue in the Fourth

6    Amendment, and that is the reasonableness of the search

7    or seizure. It's got to be an unreasonable seizure.

8                MR. WILBURN:  It's two components.  It's

9    unreasonable and --

10               THE COURT:  Illegal and a seizure, to

11   violate the Fourth Amendment.

12               MR. WILBURN:  Right, and what occurs here

13   under the statute is, as a matter of law, not

14   unreasonable because it's authorized by statute and the

15   concept is consistent with the Commonwealth.  So you

16   don't have the unreasonable element. You also don't have

17   the seizure element.  The seizure element, the police in

18   the Sixth Circuit case, actually took the numbers which

19   the gun owner, illegal or otherwise, had a possessory

20   interest at the time, and they took them and utilized

21   them.  The Court found it was both unreasonable and a

22   seizure.  In the instant case, the access, every Court

23   that's looked at it said it's not unreasonable.  It's

24   consistent with the police power and consistent with the

25   common law which has existed for several hundred years.

1    So you don't have unreasonable.

2              THE COURT:  Would it be an unreasonable

3    seizure in this case were this pipeline to go across the

4    curtilage of a home? In other words, some of these

5    landowners have large parcels of property.  The

6    plaintiffs in this case, I can't remember whether it's

7    three or more, but the parcels involved are unlike the

8    Presley case out of Charlottesville.  These are large

9    parcels of property; okay?  If the pipelines were to go

10   across the curtilage, would that give rise to a claim

11   for an unreasonable seizure under the Fourth Amendment?

12             MR. WILBURN:  It would not, for several

13   reasons. The first is --

14             THE COURT:  The Fourth Amendment addresses

15   curtilage.

16             MR. WILBURN:  It does address curtilage, but

17   before a pipeline could be constructed within the

18   curtilage or otherwise, there has to be an issuance of a

19   CPCN, a Certificate of Public Convenience and Necessity,

20   which is a finding the project is in the public interest

21   and is appropriate.  Then there has to be a

22   condemnation.  There would have to be a condemnation to

23   acquire those rights. You can't access the property to

24   construct it in the curtilage or elsewhere until you

25   acquired those rights.  If you acquired the rights and

1    compensated, it can't be an unreasonable access.

2              The second reason it wouldn't is federal law

3    governs the location of pipelines in relationship to

4    homes.

5              THE COURT:  But you haven't told them where

6    this pipeline is going to go across their properties.

7    They have asked for and you have not given them any

8    suggestion as to where on their property Dominion is

9    going to go.  Don't you think these landowners are

10   entitled to know where you're going to be coming in and

11   where this proposal is before you just willy-nilly walk

12   on their property?

13             MR. WILBURN:  Your Honor, they're entitled

14   to know where we're going on their property.  Where the

15   pipeline is going to go -- and that's sort of where the

16   argument the landowners assert is backwards.  In order

17   to construct the pipeline, you have to obtain approval

18   from FERC.  That's the CPCN.  In order to obtain

19   approval from FERC, you have to submit an application --

20             THE COURT:  I understand that, but you know

21   now, you have an idea now as to where this pipeline

22   might go; right?

23             MR. WILBURN:  We --

24             THE COURT:  Otherwise, you wouldn't have

25   given notice to these landowners, right?

1          MR. WILBURN:  We have an idea we believe it

2    might go in a corridor study area, which is a relatively

3    wide area.

4          THE COURT:  Shouldn't you tell these

5    landowners and shouldn't your notice let these

6    landowners know which part of their property that

7    Dominion is interested in looking at, rather than just

8    saying we're giving you notice and we refuse to tell you

9    where it's going to go? Shouldn't you be required to let

10   them know where on the property the pipeline is going?

11   And my question goes to this to your motion to dismiss,

12   okay?  The absence of those facts as to where on the

13   property the pipeline might be located and where on the

14   property these folks would walk for the entry upon

15   survey, okay, because I don't have that fact, can I

16   reach it at the motion to dismiss stage?  Because I

17   don't know where on Mr. Klemic's property, this big

18   parcel -- how do I know whether it's going near the

19   house or near the curtilage?  So for a Fourth Amendment

20   claim, at this stage, without more facts, how do I know

21   whether it's not an unreasonable seizure?

22          MR. WILBURN:  Because on a facial

23   constitutional challenge, it's not dependent upon the

24   facts.

25          THE COURT:  Facial constitutional, but he's

 1   also saying as applied and he pled both facial and as

 2   applied.

 3                MR. WILBURN:  Right.  As applied --

 4                THE COURT:  He may have abandoned one in his

 5   brief, but he certainly pled both.

 6                MR. WILBURN:  He's pled both.

 7                Facial, it doesn't matter.  You look at the

 8   statute.  As applied, there's a ripeness issue under

 9   Williamson County. You can't pursue an as applied

10   constitutional violation unless two things occur.  One,

11   the statute or regulation that allegedly deprives you of

12   a property right lacks a remedy and this has a remedy

13   built into it and that's the Fourth Circuit decision we

14   cited, the Doe decision, which is on point.  It's also

15   the Williamson County decision, which the U.S. Supreme

16   Court held you can't bring an as applied Fifth Amendment

17   takings claim unless and until there's been an

18   application for and denial of compensation under the

19   state process.

20                THE COURT:  How does that jive with the

21   Patsy case where the Supreme Court said in Patsy that

22   there is no requirement of exhaustion before a plaintiff

23   can bring a 1983 suit? Obviously, that was a different

24   case. It was a Title VII claim.  But isn't -- how do you

25   square Patsy with these other Fifth Amendment cases, for

```
 1    example, where you say you don't have a claim until
 2    there's a finality and you go through the state process?
 3              MR. WILBURN:  I think that's easily
 4    reconciled because in the Patsy decision, there was not
 5    a statutory remedy, remedial process built into the
 6    statute.  There was an alleged deprivation of a
 7    constitutional right, but it wasn't a deprivation of a
 8    property right for which there are multiple state
 9    remedies that are developed.  So, I agree with the
10    position taken by the plaintiffs in a portion of their
11    brief, but there's no Williamson County exhaustion
12    requirement if there are no available state remedies,
13    and that's the Patsy decision that he cites.
14              THE COURT:  He says this, just for the sake
15    of argument.  He argues this.  I've got no remedy.  I've
16    got no remedy because the taking here, he argues, is the
17    coming onto my land, okay? And the statute only provides
18    compensation if there's damage.  He says the
19    constitutional violation is the allowing these people to
20    walk and do their survey on my land. He says there's no
21    remedy for that.  So, how do you deal with that, Mr.
22    Wilburn?
23              MR. WILBURN:  Well, it presupposes a taking,
24    which presupposes a property right to exclude all
25    others.  But counsel's argument relies only on the
```

1    damage section of 56-49.01(b).  There's another

2    provision which is ignored in that argument.  That's

3    801-184, which is sort of the kick-off in the inverse

4    condemnation process.

5              THE COURT:  Can you get inverse

6    condemnation? If they just walk on your property and get

7    their little thing on the tripod that does the survey

8    and they just walk across the corner of the property and

9    do their little survey and don't damage anything, do you

10   have an inverse condemnation claim?

11             MR. WILBURN:  It's not that -- it's not an

12   inverse condemnation claim because there's no taking of

13   a property right.  That's the problem.  Counsel's

14   conflating the idea that there's a property right with

15   lack of remedy and they are two separate concepts.

16   Presupposing that there's a property right that's taken,

17   and all of the case law says what Your Honor described

18   is not a taking, but assume that there is.  He's got

19   remedies both under subsection B of the applicable

20   statute and under 801-184.  So, there are remedies

21   available and those remedies preclude bringing an as

22   applied constitutional challenge.  That's sort of

23   working back to the Court's original question.

24             So, no facts are necessary in the first

25   instance because it's a facial constitutional challenge.

1    You never get the facts in discovery.

2            THE COURT:  Let me ask you a different

3    question.  Do I need to even get to any of this? Do I

4    need to get to the merits of the Fifth Amendment of

5    whether there's a taking? Do I need to get to the merits

6    of a procedural due process claim? Do I need to get to

7    the merits of a Fourth Amendment unreasonable seizure

8    claim in a case where there is not one allegation in the

9    complaint that Dominion Transmission is a state actor?

10   There is not one word in the complaint that says

11   Dominion is a state actor.  Therefore, under 1983, how

12   is there any facts upon which the Court can find a claim

13   under 1983, because under 1983, it's got to be state

14   action?

15           MR. WILBURN:  Correct.

16           THE COURT:  There's nothing.  I have read

17   the complaint many times.  There is not one word in this

18   complaint that says that Dominion Transmission is a

19   state actor.

20           MR. WILBURN:  I agree with that.

21           The problem here is the plaintiff has

22   pleaded inconsistent allegations.  Number one, they

23   don't plead we're a state actor although they brought

24   four 1983-based claims.  Later in the complaint and

25   throughout their opposition papers, they argue the

1    motivation is private pecuniary business gain, which

2    would be inconsistent with the third factor the Supreme

3    Court set out in establishing whether you're a state

4    actor.  The plaintiff can't plead that this is all about

5    private pecuniary activity and at the same time, bring

6    federal constitutional claims.  Those constitutional --

7            THE COURT:  By the same token, how can you

8    argue that you're not a state actor, but yet, that this

9    pipeline, if approved -- big if -- by the folks in

10   Washington at the federal Energy Regulatory Commission,

11   would serve a public purpose?  Is your argument

12   inconsistent?

13           MR. WILBURN:  It's not.  We don't argue

14   that.  What we write in our papers, if you accept their

15   position, then the constitutional claims must fail.  I

16   think the reasonable reading of the facts that are

17   alleged and the correct reading is we're operating under

18   the Natural Gas Act.  We're empowered by the Natural Gas

19   Act. We're governed by FERC --

20           THE COURT:  Natural Gas Act, which says

21   there's a public purpose.  371.

22           MR. WILBURN:  That's correct.  It's right in

23   the language.  If you look beyond that, then you can

24   look at East Tennessee Natural Gas against Sage --

25           THE COURT:  He says wait a minute, wait a

1  minute.  You don't have a public purpose because you

2  don't have a permit from the FERC yet.  There's no

3  public purpose here by going on the property because you

4  don't have a permit yet.

5          MR. WILBURN:  That's wrong, for a whole lot

6  of reasons.  The first is he's conflating the public

7  purpose limitation and the article in Section 11 of the

8  Virginia Constitution with the requirements of 46-49.01,

9  which don't relate to condemnation and don't require

10  public purpose.

11          When you look at the statute, the purpose of

12  a statute is to facilitate the projects of this type

13  under 15 U.S.C. 717A, which is the Natural Gas Act.

14  Subpart I says the studies are necessary to satisfy any

15  regulatory requirements.  We've cited the regulatory

16  scheme.  In order to get to that CPCN that establishes

17  the project as a public use, you have to submit the

18  studies at issue in this case and that's found at 15 CFR

19  157 -- actually, I think it's 18 CFR 157 and 380.

20          The point I'm trying to make on this, Your

21  Honor, is that the Natural Gas Act says that it is in

22  the public purpose.  In order to condemn, we have to get

23  that certificate that says the project as reviewed and

24  approved and engineered is in the public convenience a

25  necessity.  But there's nothing that requires us to have

1    that determination from FERC at this stage in the

2    process, which is merely surveys.  And in fact, you

3    would never have that determination from FERC at this

4    stage in the process because the surveys needed to get

5    there are exactly what this entry for survey statute is

6    written to allow.

7            THE COURT:  Let's hear -- anything else you

8    want to argue?

9            MR. WILBURN:  No, Your Honor.

10           THE COURT:  I may have gotten that cite

11   wrong. I said 741.  The provision in the Natural Gas Act

12   is 15 U.S.C. 717A.

13           MR. WILBURN:  But it says right in that

14   section it's in the public interest, is the language.

15   The point the landowners make -- they set up an

16   impossible problem to solve.  They suggest to the Court

17   it's not in the public interest until you have the CPCN.

18   But you can't get the CPCN until you do the studies

19   authorized by 56-49.01.

20           THE COURT:  Why didn't, as part of your

21   notice, why didn't you let these landowners -- give them

22   some idea as to where this -- you've got to know what

23   you're thinking about.  You've plotted this route

24   through all these counties, through another state going

25   down.  You've got -- you have to know, in some general

1    sense, where across these properties these pipelines are

2    going to go.  And shouldn't you give these landowners

3    some idea whether it's going to be close to their house,

4    right next to their house, way down across the pasture,

5    way down across the hill?  Some of these properties are

6    hundreds of acres.  Shouldn't you be required -- the

7    statute doesn't say you have to do that, but shouldn't

8    you have done that?

9                 MR. WILBURN:  Well, sort of outside, I

10   think, the argument, but I can represent to the Court

11   that that's exactly the type of thing that we have done

12   with landowners. We've offered all sorts of conditions

13   --

14                THE COURT:  They say in their brief you've

15   refused.

16                MR. WILBURN:  Your Honor, I'll disagree with

17   that and I'll represent to the Court that we've made

18   every effort, and this is more in terms of how you

19   resolve these problems as opposed to constitutional

20   requirements.

21                THE COURT:  Have you filed suit in state

22   court against these folks, the plaintiffs in this case?

23                MR. WILBURN:  Not against the plaintiffs in

24   this case. We have respected the fact they've filed this

25   action and are awaiting a decision by this Court on this

1    action before we move forward.

2              THE COURT:  Have you filed suit against

3    other landowners seeking Court approval under this

4    statute?

5              MR. WILBURN:  We have, Your Honor.

6              THE COURT:  In those suits, have you told

7    the landowners where across their property you might be

8    interested in building this pipeline?

9              MR. WILBURN:  I don't think it's referenced

10   in those suits. I don't believe it is, Your Honor.

11             THE COURT:  It just seems to me if these

12   folks have land and this is at the very initial stages

13   of trying to determine -- this pipeline may never be

14   built.  This pipeline -- and that's not up to me.

15   That's up to other folks.  But seems to me you ought to

16   let them know where on your property you're thinking

17   about doing this.

18             MR. WILBURN:  Your Honor, I agree with that

19   and I don't want to suggest there's a legal requirement,

20   but I will represent to the Court, and it's outside

21   these papers, the company has had open houses.  They're

22   willing and have offered to meet with any landowner.

23   They've offered to show them in any way they want.  The

24   reality here is that we have firm no's from hundreds of

25   people and firm no's that are without regard to any

1  conditions of duration or where it is or what we do.

2  These are firm no's that simply say we don't want the

3  pipeline project coming at all, anywhere.  So certainly

4  we're arguing about the access statute.  But this is not

5  a circumstance where the company has ignored landowners

6  and refused either to meet with them, explain with them

7  or agree to reasonable conditions on access.

8              THE COURT:  I don't know. I just know in his

9  brief that Mr. Walters argues the pipeline company has

10 refused to tell them where across the property these

11 folks are interested.  That just seemed to me to be an

12 unreasonable position.

13             MR. WILBURN:  It's not something we

14 addressed because it was outside the pleadings.

15             THE COURT:  It is outside the pleadings and

16 it may not be an issue for me to deal with at all.

17             MR. WILBURN:  But I can tell the Court and

18 if anybody is in the courtroom and other attorneys here

19 and they want to know or talk or sit down, we tried for

20 a period of months before instituting any of these

21 actions to do exactly that.

22             What is really going on here is, it's a no,

23 a hard no, not now, not ever, and that's why we're

24 before the Court.

25             THE COURT:  Anything else you'd like to say,

```
 1   Mr. Wilburn?
 2              MR. WILBURN:  No, Your Honor.
 3              THE COURT:  Let's hear from the
 4   Commonwealth.
 5              MR. RAPHAEL:  Good morning, Your Honor.
 6   Stewart Raphael for the Commonwealth.
 7              We intervened in this case to defend the
 8   constitutionality of the statute as a facial matter.
 9   We're not here to defend this particular project.
10              THE COURT:  You argue in your brief though
11   with regard to as applied, it's unripe.
12              MR. RAPHAEL:  That's exactly right.  It is
13   unripe because it's undisputed Dominion has not gone on
14   the property.  We do agree with Dominion's counsel that
15   under Williamson, the claims are not ripe until they've
16   attempted to exhaust their state law remedies for that.
17              I think the answer to your question, by the
18   way -- how do you square Williamson and Patsy, is that
19   the cause of action for a taking of property or taking a
20   property without due process, the cause of action
21   involves the failure to provide process and state law is
22   the process that is provided and that's why --
23              THE COURT:  No process in Patsy -- of
24   course, they said you didn't exhaust your state
25   remedies, in Patsy.
```

```
 1              MR. RAPHAEL:  Right.

 2              There's actually a similar case that went up

 3    to the Supreme Court from the Fourth Circuit I was

 4    involved with at the cert stage. It was Doe v. Virginia

 5    State Police, and the issue there, a lady had been

 6    convicted of a sex offense and after she was convicted,

 7    she was put on the sex offense registry and wanted to

 8    get off.  She said I've got no process because I was put

 9    on the registry after my conviction. We argued

10    successfully she wasn't entitled to process in that

11    situation because the fact of the conviction alone meant

12    that she went on the registry and the legislature was

13    entitled to make that categorical determination.  But

14    the same argument was made there.  There was a failure

15    -- we were alleging a failure to exhaust --

16              THE COURT:  The Supreme Court denied cert in

17    that case.

18              MR. RAPHAEL:  That's correct.

19              But the Commonwealth intervened because

20    although we're focused here on this natural gas --

21              THE COURT:  Your argument is not focused on

22    this project.  You don't have a dog in that hunt. Your

23    argument is you believe this particular statute is

24    constitutional.

25              MR. RAPHAEL:  That's exactly right.
```

1          If the Court were to declare this statute

2     unconstitutional, it would also, we think, result in

3     declaring the other entry for survey statutes

4     unconstitutional, 56-49 and 25.1-203, which is the

5     statute that all localities and state government use to

6     get on property for survey purposes pre-condemnation.

7          What I'd like to do in my argument today --

8     I know Your Honor is very well prepared.  I'd like to

9     respond to what I think are the four arguments that were

10    raised in the brief that the plaintiffs filed on Monday,

11    which is the last paper the Court got.

12         THE COURT:  Right.  I read that.

13         MR. RAPHAEL:  Their first argument is that

14    takings cases involve very fact specific inquiries --

15         THE COURT:  United States v. Place says the

16    intrusion on possessory interest occasioned by a seizure

17    of one's personal effects can vary both in nature and

18    extent.

19         MR. RAPHAEL:  They make the argument under

20    the takings clause jurisprudence, too.  It's very fact

21    specific.  But I'd like to echo what the Court said

22    earlier.  The only claim that's ripe here is the facial

23    challenge.  You have to distinguish the facial challenge

24    from the as applied challenges.  The as applied

25    challenges should be dismissed without prejudice.  If

1   Dominion goes too far with this particular property,

2   they can bring a claim later.  The as applied claim

3   would be dismissed without prejudice.

4               THE COURT:  Do you think they can bring a

5   claim later? Let's say they go too far.  What do you

6   mean when you say they go too far? What do you mean?

7               MR. RAPHAEL:  I don't know what facts might

8   suggest they would go too far.  For example, if they

9   brought a bulldozer into the curtilage in the dead of

10  night.

11              THE COURT:  The statute doesn't allow them

12  to bring anything other than a hand tool.  No power

13  equipment.

14              MR. RAPHAEL:  That's exactly right.

15              THE COURT:  They can't bring a weedeater

16  with a battery.  They can bring a shovel maybe and some

17  of those lopper kind of things, but they can't bring any

18  power equipment.  They can't bring any vehicles.

19              MR. RAPHAEL:  That's right.

20              But my point is --

21              THE COURT:  My question I'll ask the

22  plaintiff is, where's the taking?

23              MR. RAPHAEL:  That's exactly right.

24              But any of those hypotheticals would be an

25  as applied challenge and that's just not ripe.  If it

1    ever happens, if they can come up with any scenario, if

2    it ever happens, they can bring the case back.

3              With regard to the facial challenge, the law

4    is clear that a facial challenge cannot succeed unless

5    the statute is unconstitutional in every application and

6    that's the well established Solerno line of authority,

7    Washington State Grange vs. Washington State Republican

8    Party, 552 U.S. 442.  There's an en banc Fourth Circuit

9    case that makes the same point.  That's Richmond Medical

10   Center vs. Herring, 570 F.3d 165, where the Court said

11   the statute has to be wholly unconstitutional for all

12   circumstances.  That was 570 F.3d 165, at page 169.

13             So the facial challenge here clearly fails

14   as a matter of law.

15             The second point the plaintiffs make in

16   their reply is that they respond to the very long line

17   of authority that we pointed out in our Exhibits 1 and 2

18   to our intervention brief. We pointed out that

19   literally every state has an entry for survey statute of

20   some kind.  Our Exhibit 2 listed all of the cases that I

21   could find --

22             THE COURT:  Has there ever been a case that

23   you're aware of in your exhaustive research, and I

24   looked at Exhibits 1 and 2 to your brief, where a Court,

25   federal or state, any kind of Court has held that a

1    statute allowing a natural gas company or a public

2    utility to go in and do a survey violates the

3    constitution, a state constitution or the federal

4    constitution?

5             MR. RAPHAEL:  The Property Reserve case in

6    California, there was a Court of Appeals decision.  It's

7    cited in our Exhibit 2.  The Court of Appeals said that

8    as applied, the state went too far in what they were

9    doing.  They drilled, for example, 200-foot holes,

10   filled them with concrete.  They had mechanized

11   equipment.  They did things that you couldn't do under

12   the Virginia statute.  That case is on appeal to the

13   California Supreme Court.  The briefing is underway now.

14   When the Supreme Court of California granted review in

15   that case, it vacated the Court of Appeals decision.  So

16   it's no longer citable.

17            THE COURT:  Is that a facial challenge or as

18   applied challenge?

19            MR. RAPHAEL:  I read it as an as applied

20   challenge.  It was not a challenge to the statute on its

21   face.

22            So, the answer to your question is I'm not

23   aware of any case that has struck down one of these

24   statutes facially.  If somebody goes too far or abuses

25   the privilege -- just like, by the way, common law.  We

```
 1    point out in our brief, Section 211 in the Restatement
 2    of Torts --
 3              THE COURT:  You go back a ways.
 4              MR. RAPHAEL:  Yes, sir.
 5              There's a common law privilege to go on
 6    property for survey purposes pre-condemnation.  But as
 7    Comment G points out, if you abuse the privilege, if
 8    it's unreasonable, you're liable for trespass.  That's
 9    kind of analogous to the point that in an as applied
10    challenge, if you go too far, you could have a claim.
11    But that's not before the Court today.
12              The plaintiffs try to distinguish this very
13    long line of consistent authority on our side by saying,
14    well, it was all overruled sub silentio by Loretto, in
15    1982.  That's the cable case.
16              THE COURT:  The New York cable TV case.
17              MR. RAPHAEL:  Right.
18              They said Loretto sub silentio overruled all
19    those cases.
20              A couple responses to that.  First of all, I
21    take that point as a concession that they recognize
22    there is no common law right to exclude in all
23    situations, let alone in the situation of a
24    pre-condemnation survey.  There's no response to our
25    Virginia law and common law arguments in their papers.
```

1          The next point I'd make on that, there's

2    really nothing in Loretto to support that notion.

3          THE COURT:  The deal in Loretto is

4    permanent.

5          MR. RAPHAEL:  It was permanent, that's

6    right.

7          THE COURT:  The first line of the Loretto

8    opinion says this case presents the question whether a

9    minor but permanent physical occupation of an owner's

10   property authorized by government constitutes a taking

11   of property for which just compensation is due under the

12   Fifth and Fourteenth Amendment of the Constitution.

13   Then at the end, on page 441, the Supreme Court says,

14   our holding today is very narrow.  I think this may have

15   been Justice Marshal, as I recall.  I read so many cases,

16   it's hard to keep them all straight.  Our holding today

17   is very narrow.  We affirm the traditional rule that a

18   permanent physical occupation of the property is a

19   taking.

20          Sure, if they were to come in and put a pole

21   up or do something, that's a taking.  But just to come

22   in and do a survey on a temporary basis, I think Loretto

23   is distinguishable.

24          MR. RAPHAEL:  That's exactly right.

25          Sierra Tahoe was the case where there was a

1    32-month moratorium on any construction and the Court

2    said that wasn't too long.  Permanent is permanent. It's

3    for a very long time.

4                THE COURT:  Even though -- the issue there

5    was it was just cable boxes.

6                MR. RAPHAEL:  That's right.

7                THE COURT:  Or some sort of wires and stuff,

8    yeah.

9                MR. RAPHAEL:  That's right.

10               The other thing I'd point to in Loretto is

11   footnote 12 at page 435 of the opinion.

12               THE COURT:  Hold on. Let me pull it up.  I

13   have them all right here.

14               MR. RAPHAEL:  On page 435.

15               The Court in that footnote says in the

16   second sentence, not every physical invasion is a

17   taking, right? So the fact that this is a physical

18   invasion does not make it a taking.  It has to be

19   significantly more than that.  In Loretto, it was a

20   permanent physical invasion.

21               THE COURT:  He argued though physical

22   invasion cases are different from a regulatory taking.

23               MR. RAPHAEL:  And they are.

24               THE COURT:  So you agree with him.

25               MR. RAPHAEL:  I agree that physical invasion

1    cases are different from regulatory taking cases.

2              We make two points in our brief.  One is

3    that there is no right to exclude in this situation.

4    There's no common law right.  That's the no property

5    right argument.  The other argument we make is assuming

6    for the sake of argument that there is a right to

7    exclude in this situation, that there is a property

8    right, the intrusion is sufficiently de minimis that

9    under PruneYard, it doesn't rise to the level of a

10   taking.  But I think doctrinally, the better answer --

11             THE COURT:  PruneYard is a very different

12   case.  PruneYard is the leafleting case at the mall in

13   California.

14             MR. RAPHAEL:  It is.  But what's similar,

15   the Court in PruneYard says -- there, there was a right

16   to exclude.  There was a common law right to exclude.

17             THE COURT:  And the California Supreme Court

18   said First Amendment overcomes that.

19             MR. RAPHAEL:  The California constitution

20   gives leafleters a right.  PruneYard said yes, you've

21   taken the right to exclude in that situation, but it's

22   not sufficiently a big deal in that context to

23   constitute a compensable taking.

24             Sure, there are factual differences between

25   PruneYard and this case, but the common denominator is

1   it's a minimal minor intrusion compared to the use of

2   the property.

3                  THE COURT:  Can I make that judgment in the

4   challenge, the facial challenge that's alleged here?  Or

5   do I need facts?

6                  MR. RAPHAEL:  Yes, you can make that

7   judgment on a facial challenge because remember, their

8   burden is to show the statute is unconstitutional in

9   every application.  So clearly, there are going to be

10  situations where the utility spends just moments on a

11  piece of property.

12                 THE COURT:  You're saying as applied is not

13  right.

14                 MR. RAPHAEL:  That's exactly right.

15                 THE COURT:  What about the Presley case?

16                 MR. RAPHAEL:  The case out of

17  Charlottesville?

18                 THE COURT:  Folks owned some property along

19  the Rivanna River.  City of Charlottesville and some

20  foundation that does trails issues a map that shows a

21  trail running across Ms. Presley's property and so --

22  she's not there. She's off taking care of her ill

23  parent, I think.  She comes to find these people have

24  been camping and trashing her property and they made

25  this trail across there.  And the Court in that case

1   finds a Fourth Amendment violation, does it not?

2          MR. RAPHAEL:  Yes, it does, but the case

3   factually is completely distinguishable.  Number one, in

4   Preston (sic), there was a property right.

5          THE COURT:  Presley.

6          MR. RAPHAEL:  Presley.

7          There was a property right.  She has a right

8   to keep people off her property.

9          THE COURT:  Don't these folks have a right

10  to keep people off their property?

11         MR. RAPHAEL:  Not for all purposes.  That's

12  the Section 211 of the Restatement.  There are 20

13  privileges listed in the Restatement.

14         THE COURT:  The thing I found interesting

15  about your brief and your argument is just how well

16  established in the law this ability to come on and

17  survey has been.  I mean, it goes back to the beginning

18  of the foundations of American jurisprudence.

19         MR. RAPHAEL:  That's exactly right.

20         THE COURT:  When you cite Henry St. George

21  Tucker -- for goodness sake.

22         MR. RAPHAEL:  It's very similar to what you

23  read in Justice Douglas's opinion in Causby.

24         THE COURT:  That's a very interesting case.

25         MR. RAPHAEL:  And a great opinion.

1           He says to think a landowner would have the

2    ability to prevent people from flying over the property

3    over the Romanesque notion that your property extends to

4    infinity would defy common sense.

5           THE COURT:  Causby, the thing that -- Causby

6    is interesting.  You have a guy with a chicken farm in

7    Greensboro, North Carolina.  Then you have the

8    government coming in and building an airport there in

9    1942 during World War II and all these big bombers are

10   coming over the guy's chicken farm and they say it's a

11   taking under the Fifth Amendment.  I don't remember

12   whether it was procedural due process or not in that

13   case, a due process claim, but the thing that was

14   interesting to me is what the opinion says.  It says,

15   page 259:  The result was the destruction of the use of

16   the property as a commercial chicken farm.  It was

17   destroyed.  The poor chickens couldn't lay eggs because

18   of all these airplanes. The opinion -- both you and

19   Dominion cites the planes were buzzing the property and

20   leaves were flying off.  It says, page 266:  Flights

21   over private land are not a taking unless they are so

22   low and so frequent as to be a direct and immediate

23   interference with the enjoyment and use of the land.

24           I guess you would argue somebody coming in

25   on a one-time basis, doing a survey, without vehicles,

```
 1   without power tools, just doesn't rise to the level of
 2   Causby.
 3              MR. RAPHAEL:  That's right.
 4              The right to fly at a reasonable altitude is
 5   one of the 20 exceptions in the Restatement. It's
 6   Section 194 in the First Restatement.  It was moved in
 7   the Second Restatement.  That's exactly what you're
 8   talking about.
 9              I want to make sure I finish answering your
10   earlier question about the Fourth Amendment and Preston
11   (sic). So, the first distinction is that there's no
12   property right here where there was there.  The second
13   distinction is that the Court assumed in Preston because
14   the property was only three-quarters of an acre on the
15   Rivanna River, the Court assumed that the people were
16   intruding into the curtilage.
17              THE COURT:  Well, the Fourth Circuit's
18   opinion uses the word "yard."
19              MR. RAPHAEL:  It does.  That's exactly
20   right.  Whereas the property there was three-quarters of
21   an acre, here, the three plaintiffs have properties that
22   are 196 acres, 30 acres and 101 acres.
23              THE COURT:  Doesn't that go directly to my
24   question that I asked Mr. Wilburn about?  We don't know
25   where these guys wants to put the pipeline.  We don't
```

1   know how close to the house they want to put it because

2   they haven't told them.

3                MR. RAPHAEL:  I can't say anything about

4   what they have or haven't told the landowners because

5   that's not what I'm here to do.  But I would say, Your

6   Honor --

7                THE COURT:  If they're given notice they

8   want across the property, they ought to tell these folks

9   what part of the property they're interested in.

10               MR. RAPHAEL:  Certainly that would be a

11  prudent business judgment to make. I'm not disputing

12  that.

13               THE COURT:  You're saying not doing it

14  doesn't make the statute unconstitutional.

15               MR. RAPHAEL:  That's true.

16               The other point I'm trying to make is that

17  for Fourth Amendment purposes, there's no allegation

18  here that the intrusion is within the curtilage and

19  unlike Preston, the facts just don't support that

20  inference.  In any event, it doesn't matter because the

21  question is the facial challenge because a facial

22  challenge would involve a theoretical intrusion both

23  into the curtilage and open field.  Certainly the open

24  field claims are not subject to a Fifth Amendment

25  allegation.

1          THE COURT:  _Presley_ is interesting for a

2    couple reasons.  One, the Fourth Circuit says the Fifth

3    Amendment also governs temporary or partial seizures.

4          What happened in that case, I think, Judge

5    Moon, and it's a Charlottesville case, he said you don't

6    have a Fourth Amendment claim because you have a Fifth

7    Amendment claim.  The Fourth Circuit said no, you can

8    have both. But it also said there's no Fourteenth

9    Amendment claim here.  They said there's no claim there

10   because, page 49 of the Fourth Circuit opinion, because

11   the only deprivation that she has alleged is effectively

12   a physical taking.  An inverse condemnation action for

13   just compensation, which is clearly available to her

14   under state law, provides the process to which she's

15   due. So even _Presley_ eliminates the Fourteenth Amendment

16   due process claim.

17         But what about the notion that _Presley_ talks

18   about a temporary seizure can give rise to a Fourth

19   Amendment violation?

20         MR. RAPHAEL:  Again, three points.

21         There's no property right here to begin

22   with.  The right to exclude somebody surveying

23   pre-condemnation is not a recognized property right

24   under the common law or under Virginia law.

25         THE COURT:  You're saying they've never had

1    it.

2              MR. RAPHAEL:  That's exactly right.

3              THE COURT:  So you're not taking anything

4    they never had.

5              MR. RAPHAEL:  That's exactly right.

6              THE COURT:  The Commonwealth always assumed

7    that a utility has the right to come on your property

8    and look to see whether or not, at the end of the day,

9    the public interest, the public purpose would be served

10   by putting a road in or a sewer or anything like that.

11             MR. RAPHAEL:  Yes.  That's Section 211

12   Comment C and Table Two from our brief.  Every state has

13   one of these statutes.

14             THE COURT:  I guess your point is if they

15   never had that property right, there's nothing being

16   taken by this statute.

17             MR. RAPHAEL:  That's exactly right.  That's

18   the first point.

19             The second point is the Fourth Amendment

20   doesn't apply outside the curtilage.

21             THE COURT:  We don't know if it's in the

22   curtilage because they haven't told them.

23             MR. RAPHAEL:  Yes, but this is a facial

24   challenge only and because it doesn't apply outside the

25   curtilage, there's no way they can win a facial Fourth

1    Amendment challenge.

2              THE COURT:  Do we need facts to address

3    that?  Do I need facts?

4              MR. RAPHAEL:  No.  Because a facial

5    challenge requires the Court to think of every possible

6    application and unless a statute is unconstitutional in

7    every application, it's not unconstitutional.  That's

8    the nature of the facial challenge.

9              The third reason there's not a Fourth

10   Amendment claim here is that even assuming there were

11   property rights, and even assuming the Fourth Amendment

12   applied, this would not be an unreasonable seizure

13   because the statute lays out a procedure for how the

14   survey is done. Notice has to be given. It's limited in

15   purpose.

16             THE COURT:  No motorized vehicles.  No power

17   equipment.

18             MR. RAPHAEL:  That's exactly right.

19             And this is not a criminal law enforcement

20   matter.  That doesn't mean the Fourth Amendment is

21   inapplicable. But it does mean that there's no

22   presumption in favor of a warrant when there's not a

23   criminal law involved.  And it would be really

24   unreasonable to expect a utility or a city or a county

25   to have to get a warrant from a magistrate before

1   conducting a survey for pre-condemnation to see if they

2   need to put a line in.

3           So, for all of these reasons, the Fourth

4   Amendment doesn't apply.

5           The third argument that the plaintiffs made

6   in their reply on Monday, they want to distinguish

7   between this statute and the other entry for survey

8   statutes by saying, well, this one requires a FERC

9   license which you don't have yet.  I think that, too, is

10  an acknowledgement there is really no limiting principle

11  to their position.  They do make an interesting

12  concession at page six of their brief where they say the

13  entry for survey idea makes good sense, quote:  In order

14  to ensure that the sovereign takes no more than is

15  necessary, surveying antecedent to condemnation makes

16  good sense for both the sovereign and the citizen. Well,

17  I read that and thought that's an amazing concession.

18          THE COURT:  That's pretty much the whole

19  point of the statute.

20          MR. RAPHAEL:  It is, but then I realized,

21  are they conceding you don't have to pay in that

22  situation? I'm not sure they are.  I would ask the Court

23  to press counsel, are they taking the position the other

24  statutes are unconstitutional or not because I don't

25  think they're clear about that.

1            With regard to their attempt to distinguish

2   this statute from the other ones, the idea there's an

3   additional government prerequisite is not a good basis

4   to distinguish them, and let me tell you why.  Under the

5   other statutes, Your Honor, for example 56-49, the entry

6   for survey statute for public service companies, if the

7   statute provides in section two that until a utility has

8   been granted a territory by the State Corporation

9   Commission or issued a certificate of public need, it is

10  not allowed to condemn property.  But it is allowed to

11  go on for survey purposes.  That's an example of a

12  governmental precondition.  You can't take it yet, but

13  you can go on for survey purposes.  So, the fact there's

14  a precondition there doesn't render the entry for survey

15  right unlawful.

16            Another example would be in 15.2-1903B.

17  That's the statute that requires a locality to have a

18  public hearing before it can actually take property, and

19  that's obviously a good idea to make sure it hears from

20  everybody who has an interest in it before it actually

21  takes the property.  But even before it has that public

22  hearing, it can go on land for survey purposes under

23  25.1-103, yet another governmental precondition, before

24  you can actually take the property that doesn't render

25  the entry for survey right invalid.

 1              The fact that FERC requires a certificate

 2   for public need, that's a good government idea, right,

 3   to make sure this line is really needed and they conduct

 4   a comprehensive environmental analysis.  If a

 5   landowner's property is in the line, they can go to FERC

 6   and say this is a terrible idea for the following

 7   reasons.

 8              THE COURT:  There's all kinds of lines being

 9   proposed in Western Virginia, and that's up to somebody

10   other than me to decide. I'm singularly incapable of

11   that.

12              MR. RAPHAEL:  Yes.

13              But the point is --

14              THE COURT:  You're agreeing with my

15   incapacity.

16              MR. RAPHAEL:  A federal judge can do an

17   amazing number of things.

18              THE COURT:  I can't do that.  I agree with

19   my incapacity.

20              MR. RAPHAEL: My point is it's kind of a

21   chicken and egg problem.  A utility can't get the permit

22   until it shows where the line is going to go and it

23   can't show where the line is going to go until it gets

24   on the land to do a survey.

25              THE COURT:  Isn't the point of this statute,

1    sure, it helps the utility if indeed there's a public

2    purpose, if indeed it's shown this pipeline is going to

3    be built.  But it also helps the landowner because it

4    helps avoid wetlands and helps avoid historic things.

5    Some of these folks have Civil War or other cemeteries

6    on their properties.  Those things need to be

7    identified.  It helps avoid environmental concerns and

8    all kinds of stuff.

9            MR. RAPHAEL:  That's exactly right, and I

10   think they concede that on page six of their reply.

11           The last point they made in their reply

12   brief on Monday, they say that the entry for survey

13   statute here can be distinguished from other ones

14   because here's, there's no police power justification.

15   I think Your Honor addressed that with Mr. Wilburn.

16   Obviously, the General Assembly exercised its police

17   powers when it enacted this statute to allow a natural

18   gas company to have entry for survey rights in order to

19   determine where to put the line so that they could apply

20   for their federal approval.

21           THE COURT:  You say it's a chicken and an

22   egg problem.  He says you have to have the chicken

23   first. He says you have to have the certificate of need

24   and a demonstrated public purpose from the FERC and then

25   you can go on the property.  Otherwise, there's no

1    public purpose.

2                    MR. RAPHAEL:  That's right.

3                    THE COURT:  But I don't know how you do

4    that.

5                    MR. RAPHAEL:  That's exactly right.  That's

6    why you have an entry for survey statute.  In fact, as

7    we point out in our brief, most courts hold that the

8    utility has this right even in the absence of a statute

9    because it would render the condemnation power useless

10   without it.  The only cases that have denied an entity

11   entry for survey rights -- we point this out in our

12   brief.  I think there are three state courts that did it

13   and that's simply because the particular entity there

14   didn't have statutory rights.  That is the minority

15   viewpoint.

16                   THE COURT:  It's not an issue here because

17   there's a statute.

18                   MR. RAPHAEL:  That's exactly right.

19                   So, I want to end by coming back to what I

20   think is really the key issue in this case and that is,

21   is there a property right to exclude? I think all of the

22   counts rise or fall based on that issue on a facial

23   challenge.

24                   As we point out, the Restatement identifies

25   20 privileges at common law where there was not a right

```
 1    to exclude.  One of them is in Section 211, acting
 2    pursuant to a governmental authority, and specifically
 3    includes the right of a utility to go on land
 4    pre-condemnation.  That rule is fully consistent with
 5    Virginia law.  At page ten of our brief, we set out of
 6    the history of Virginia statutes showing there have been
 7    entry for survey statutes in Virginia dating to the
 8    founding of the Commonwealth.  We also cited -- Mr.
 9    Wilburn mentioned the Southern and Western Railway case
10    from 1905, which is perfectly consistent with the
11    privilege.  That's the case where a railroad tried to
12    stop another railroad for coming on the property for
13    survey pre-condemnation and the Supreme Court of
14    Virginia said no, there's no actual damage alleged and
15    your remedies are limited to the condemnation
16    proceeding.  So, they're 100 percent consistent with
17    this common law privilege that we're talking about.
18            We also cited the Sansotta case from the
19    Fourth Circuit, 2013.
20            THE COURT:  That's the Nags Head case.
21            MR. RAPHAEL:  That's exactly right.
22            The important point about Sansotta and Lucas
23    -- Lucas is the Justice Scalia opinion.
24            THE COURT:  I read it.
25            MR. RAPHAEL: He does a wonderful job of
```

```
 1    laying out the law about how the Constitution does not

 2    confer property rights. You have to look to state law.

 3              THE COURT:  Property rights are a matter of

 4    state law.  There's no question about that.  Taking a

 5    property right without just compensation is the Fifth

 6    Amendment.  But property rights are traditionally a

 7    matter of state law; that's right.

 8              MR. RAPHAEL:  That's exactly right.

 9              The plaintiffs in their reply on Monday

10    cited an additional case that I don't think anybody

11    cited yet.

12              THE COURT:  What page is that?

13              MR. RAPHAEL:  I don't recall what page it's

14    on, but the case they cited is South Carolina State

15    Education Assistance Authority vs. Cavazos.  It's 897

16    F.2d 1272.  They cite from the Fourth Circuit 1990.

17    They cite this case for the proposition the right to

18    exclude is one of the sticks in the bundle of rights.

19    But when you look at the page they cite, it actually

20    reinforces this point about you have to look at state

21    law.

22              What the Court said at page 1276 of the

23    opinion, it says the essential aspects of private

24    property are for use and enjoyment of --

25              THE COURT:  Hold on one second.  Let me pull
```

```
1    that case up while you're talking about it.
2              Page 1276?
3              MR. RAPHAEL:  Yes. It's after III, the
4    paragraph that reads "the essential aspects."
5              THE COURT: I've got it.
6              MR. RAPHAEL:  So, the essential aspects of
7    private property are for use of enjoyment and disposal
8    and the right to exclude others, citing Ruckelshaus.  As
9    explained in Ruckelshaus, such property interests are
10   created and their dimensions are defined by existing
11   rules or understandings that stem from an independent
12   source such as state law.
13             That's perfectly consistent with what
14   Justice Scalia lays out in Lucas. You've got to look at
15   state law to see --
16             THE COURT:  Lucas is that Isle of Palms
17   case.
18             MR. RAPHAEL:  Yes.
19             THE COURT:  This guy wanted to build houses
20   on his property and South Carolina enacted an statute
21   that said you can't do it.  He said it rendered his
22   property valueless and was this a taking of private
23   property under the Fifth and Fourteenth Amendment.  This
24   is what Lucas says the plaintiff relies on. Page 1015.
25   In general (at least with regard to permanent
```

1   invasions), no matter how minute the intrusion and no

2   matter how weighty the public purpose behind it, we have

3   required compensation.

4            So, his point is, if you come in and you

5   don't damage, you just walk on my property, he argues

6   that is a taking and there's no compensation under the

7   statute, so it violates the Fifth Amendment.  And he

8   relies on _Lucas_ and _Loretto_.

9            Tell me why he isn't right.

10           MR. RAPHAEL:  Because _Lucas_ says you have to

11  look at whether you had that right to begin with and you

12  don't.  This is not one of the sticks in your bundle.

13  Just like you don't have the right to stop the airplane

14  from flying overhead, right, like the Court said in

15  _Causby_.  The world would come to a crashing halt if you

16  had that kind of right.  You don't have the right to

17  stop the police officer from apprehending the fleeing

18  felon on your property or to stop the sheriff from

19  serving process or to stop the motorist from coming on

20  your property when a tree falls on the road and prevents

21  him from continuing on the road.  Those are the

22  exceptions laid out in the Restatement, which are

23  perfectly consistent with Virginia law.  It is not a

24  stick in the bundle to begin with.  That's the point of

25  _Lucas_.

```
 1              Justice Scalia was pretty skeptical Georgia

 2   was going to be able to show this was a right --

 3              THE COURT:  Lucas -- Isle of Palms, South

 4   Carolina, just north of Charleston.

 5              MR. RAPHAEL:  Sansotta follows Lucas.  The

 6   Town of Nags Head declared a bunch of houses nuisances

 7   because the beach had eroded.

 8              THE COURT:  There was a big storm that came

 9   in and the houses are sitting out there and the people

10   wouldn't do anything about it.

11              MR. RAPHAEL:  Right.  And the town said you

12   have to tear down the house and the Fourth Circuit said

13   it's not a taking because under North Carolina law, you

14   don't have the right to maintain your property as a

15   nuisance, so you get paid zero.

16              This case is not anything like that case.

17   It's not dramatic like that case is.  But the underlying

18   legal point is the same.  There is not an underlying

19   property right here to exclude and that's Section 211C

20   of the Restatement.

21              As in Sansotta, there's no reason to think

22   the right to exclude applies here.  That's why there's

23   no taking claim, why there's no due process violation

24   and why there's no Fourth Amendment violation.

25              THE COURT:  Thank you for that, Mr. Raphael.
```

1              Mr. Walters, it's your turn.

2              MR. WALTERS:  Thank you, Your Honor.

3              THE COURT:  Tell me why you think that these

4    folks on behalf of Dominion and the State haven't got it

5    right.

6              MR. WALTERS:  I'll be glad to, Your Honor. I

7    know the Court is going to have a lot of questions. I'll

8    start and the Court can sort of direct me where I go.

9              I can't tell you how many hundred cases I

10   read before I filed the case.  I'm not trying to make a

11   proffer, but I obviously knew coming in people would

12   say, oh, there are all these cases.  Let me start right

13   there.

14             With all due respect to the arguments of

15   counsel, there is, in fact, a fundamental right in this

16   stick of bundles to exclude other people on your

17   property.  That's what makes it America.  That's what

18   makes it private property.

19             THE COURT:  What about all the law that is

20   attached in the appendix dating back all the way in the

21   Restatement that says look, this is not part of your

22   property right?  A utility always has the right to come

23   on.  This is back from -- I'm looking at Tom Cooley.

24   They named a law school in Michigan State after him.

25   1888, a treatise of the law of torts.  It says, so the

1    statutes which permit lands to be taken for public

2    purposes may provide for preliminary surveys in order to

3    determine the necessity for any particular appropriation

4    and thus providing the license and entry on the land for

5    that purpose.  That's more than a hundred years ago.

6              MR. WALTERS:  I completely agree and I'm

7    happy to address that question.

8              Part of the problem here is the sort of glib

9    way, you know, 65 cases spanning 150 years are cited.

10   The real issue is you have a fundamental right to

11   exclude others. We completely agree there are exceptions

12   to that rule.

13             THE COURT:  1868, statute called or a book

14   called A Treatise on the Constitutional Limitations

15   Which Rests upon the Legislative Power of the States of

16   the American Union.  Page 560.  No constitutional

17   principle, however, is violated by a statute which

18   allows private property to be entered upon and

19   temporarily occupied for the purpose of a survey and

20   other incipient proceedings with a view to judging and

21   determining whether the public needs to acquire the

22   appropriation or not and if so, what the property

23   location shall be and the party acting under the

24   statutory authority would not have been found to make

25   compensation for the temporary possession nor be liable

1     to action of trespass.

2              Wouldn't I have to be turning more than

3     100 years of jurisprudence of this country on its head

4     to agree with you?

5              MR. WALTERS:  No, Your Honor, because one

6     very simple reason.  This statute does not require there

7     be incipient condemnation proceedings, that condemnation

8     proceedings be contemplated or that condemnation

9     proceedings ever occur.  The point we tried to make in

10    our brief, Your Honor, if what you are saying is yes,

11    I'm going to condemn some portion of this property --

12             THE COURT:  They're not doing it because, as

13    you say, they want to build a road to a resort or

14    something.  The whole reason they want to do this is

15    because they want to build a pipeline.

16             MR. WALTERS:  That may be, Your Honor, but

17    the statute doesn't require that.  The statute says

18    and/or on to conduct a survey to satisfy regulatory

19    requirements, to select the most advantageous location

20    or route, the improvement or straightening of its line

21    or works, changes of location or construction or

22    providing additional facilities.  It doesn't say only if

23    you're going to be condemning land to put in a pipeline

24    project or an overhead utility line.

25             THE COURT:  But it's a natural gas company.

```
 1    That's why they're doing the survey.  They're doing
 2    something for a natural gas company.  They're not
 3    building a tennis court.
 4             MR. WALTERS:  The statute says to construct
 5    facilities.
 6             THE COURT:  For the selection of the most
 7    advantageous location or route, the improvement or
 8    straightening -- that's what they're doing.
 9             MR. WALTERS:  Changes of location --
10             THE COURT:  They're coming in to decide, you
11    know, what's the most advantageous location or route.  I
12    understand why all your clients and all these folks here
13    don't want a natural gas pipeline to go across their
14    property.  I understand that.  So, the question is
15    though -- first, let me ask you this question.
16             Are you making an as applied or a facial
17    challenge, because it's a little hard to discern from
18    your pleadings?
19             MR. WALTERS:  Justice Roberts might suggest
20    there's really no distinction between --
21             THE COURT:  He's way smarter than I am.
22             MR. WALTERS:  He's way smarter than I am,
23    but I don't always agree with him though that there may
24    be a distinction.
25             I believe, Your Honor, we have pled an
```

1   attempt to make both, which is as applied statute

2   requires no connection to condemnation proceedings,

3   eminent domain proceedings, anything like that

4   whatsoever.  It simply says a natural gas company can

5   come on your property to conduct surveys, to provide

6   additional facilities, engage in construction, change

7   location, straighten its line if it were so inclined.

8   It can come on to do that.  No requirement there be

9   eminent domain proceedings.

10          THE COURT:  Doesn't the statute assume --

11  isn't this statute for the benefit -- why should a

12  company have to go ahead and start eminent domain

13  proceedings before they know where the line is going to

14  go? That just makes no sense.

15          MR. WALTERS:  Well, Your Honor, I think the

16  General Assembly would disagree.  There are three sort

17  of procedures in Virginia.  There is what's called the

18  quick take and what's called the slow take and I guess

19  this statute is probably the no take proceeding.

20          THE COURT:  I agree with you this may be no

21  taking.

22          MR. WALTERS:  We'll get to that.  I'm not

23  saying that.  I'm saying no taking procedures.

24          In 25.1-223, which is the slow take statute,

25  that Dominion says we can't use the quick take statute,

1    we have to use the slow take statute, that statute has

2    been in the Commonwealth for decades. Here's what

3    happens.

4                    THE COURT:  So has this one.  This statute

5    has been there back to the beginning of the 20th

6    century.

7                    MR. WALTERS:  This statute has only been

8    there since 2004.

9                    THE COURT:  But various iterations, if you

10   believe the Commonwealth's brief.

11                   MR. WALTERS:  I don't necessarily believe

12   the Commonwealth's brief in that respect, Your Honor.

13   In others, they would argue similar and I would argue

14   dissimilar context that existed.

15                   If I might indulge this for a minute,

16   because it answers the Court's questions about doesn't

17   this make sense.  24.1-223, which is the slow take, says

18   here's how it works.  You file your condemnation

19   petition.  Then within 21 days, unless the Court

20   shortens the time, then you can apply to this Court to

21   go onto somebody's property and --

22                   THE COURT:  But that statute doesn't have

23   anything to do with this whole process with the FERC.

24   It doesn't have to do with the Natural Gas Act.  It

25   doesn't have to do with interstate gas pipelines.

1          MR. WALTERS:  It was to address the Court's

2     question of does it make sense.  Is it the only way to

3     do this? No.  For a long time, the Commonwealth has said

4     in respecting that right, how you do it when you're

5     going to condemn property.

6          THE COURT:  Maybe if the pipeline company

7     comes across to do this survey, maybe some of these

8     landowners would say this isn't the best spot for it,

9     let me tell you why.  We have these wetlands, we have

10    this snail darter here that lives here.  We have a

11    confederate cemetery.  We have Indian mounds.  Just

12    allowing them to survey, I just don't see where anything

13    is taken from the landowner.

14         MR. WALTERS:  Sure, Your Honor.  What is

15    taken is their right to exclude others and this gets to

16    looking at what all these cases say. I agree with Mr.

17    Raphael.  There are all kind of exceptions to that

18    right.  The hot pursuit, the burning building, the tree

19    diseases, those kind of things where the Commonwealth is

20    exercising traditional police powers.  But there is no

21    right since the beginning of the 17th century for a

22    private company to simply come on your property for its

23    business purposes.  Again, I realize this is where

24    looking at these cases and saying, oh, they stand for

25    this broad proposition of surveying, and I'll get to

1    that, as if that had some definitive meaning when it's

2    done pre-condemnation doesn't result in a taking.

3            First off, you have to determine what is

4    meant by surveying.  To put the point I'm trying to make

5    here in context, there's a case that Dominion cited,

6    Oglethorpe Power vs. Goss, from the Georgia Supreme

7    Court.  Like many of these cases, it cites nary a

8    federal case.  So you have to look at all these

9    surveying cases in the context of, well, it may not be

10   relevant what Georgia's state law is on these issues.

11   But it's very careful to say a couple things I think

12   carry throughout all these cases.

13           First off, when there is going to be a

14   condemnation proceeding, which 56-49.01 does not require

15   at all, when there is going to be one, then to allow

16   this antecedent surveying makes sense because there's

17   ultimately going to be a hearing.  There's going to be

18   an establishment of a purpose.  There's going to be

19   availability to damages remedy and in that context, yes

20   --

21           THE COURT:  If a pipeline ever gets built,

22   they'll have all that.

23           MR. WALTERS:  And if it doesn't get built,

24   it won't.

25           THE COURT:  If it doesn't get built on the

1    property, where's the taking?

2           MR. WALTERS:  The taking occurs when five

3    teams of people march across the property, clearing

4    property, digging holes --

5           THE COURT:  Let's say this statute could be

6    accomplished with two people and a tripod, a survey.

7    Walk across your property.  You're telling me two folks

8    with a surveyor's tripod, walking across the property,

9    constitutes a constitutional taking for Fifth Amendment

10    purposes.

11           MR. WALTERS:  When it's not antecedent to a

12    condemnation proceeding, yes, sir.

13           THE COURT:  Isn't it -- how can you say it's

14    not antecedent to a condemnation proceeding when the

15    whole point of this is decide where to put the pipeline?

16    Or if a pipeline can even be put in?

17           MR. WALTERS:  This, Your Honor, gets to the

18    12(b)(6) stage, which is what facts can we assume versus

19    what facts are pled and what facts are people arguing in

20    their briefs before we get to the right state in this

21    case.

22           I would go back to the extent it's a facial

23    challenge, Your Honor --

24           THE COURT:  Let's just talk about the second

25    line of your complaint.  Dominion Transmission is

```
 1    presently engaged in efforts to extend an interstate
 2    natural gas pipeline through the Commonwealth of
 3    Virginia. The proposed route extends through Nelson
 4    County.  You've alleged this. Of course, that's what
 5    this is all about.  Now you want to say, no, no, no, no,
 6    you've got to put the chicken before the egg.
 7              Does that really make any sense?
 8              MR. WALTERS:  It certainly does from my
 9    chicken coop, Your Honor.  I'll try to explain why.
10              THE COURT:  It depends if there's a big
11    airplane flying over it.
12              MR. WALTERS:  Part of the thing is a whole
13    bunch of things are getting mixed and I don't want to go
14    down too many sidetracks, but Causby and Kaiser Aetna
15    deal with what is permanent and what is not.
16              THE COURT:  This is a very different case
17    from Causby and Kaiser Aetna.  In Causby, the Supreme
18    Court says the chicken farm had permanently been
19    disabled.  In Kaiser Aetna, these folks own a pond in
20    Hawaii, and there's a little berm or beach or some land
21    in between the bay and the pond.  So what they do is
22    they develop this pond into a marina and they cut a hole
23    in the berm so that boats can come in from the bay. The
24    federal government comes in and says, a-ha, it's now
25    navigable servitude, we're going to let everybody in.
```

1    And the landowners say we want to charge $72 a month per

2    year for these folks to come in and do that and you've

3    taken something from me. The Court said yeah, in that

4    case, there's a navigable servitude on private property,

5    and it was done permanently.  They couldn't charge

6    anymore.  That's way different from this case.

7              MR. WALTERS:  I would respectfully disagree

8    with respect to the question of permanence.

9              First off, the Court was clear to point out

10   in Kaiser that there were no facilities constructed by

11   the federal government whatsoever.  So there was no

12   physical occupation by the government at all.

13             THE COURT:  But the federal government took

14   their ability to charge -- they took the marina

15   developers' ability to charge a fee.  They took that

16   away.  It was really a regulatory taking case.

17             MR. WALTERS:  I disagree. I think what the

18   Court described there, they took away the marina owners'

19   right to exclude others, which is --

20             THE COURT:  They wanted to charge a fee for

21   it.

22             MR. WALTERS:  That was not an issue in the

23   Court's decision.

24             THE COURT:  The importance about Kaiser

25   Aetna is it's permanent.  Here, all you're talking about

1   is letting the gas company, without motor vehicles,

2   without power equipment, come on and see, does it make

3   sense or does it not make sense to locate a pipeline on

4   this property.  That's far different from a situation

5   where something is permanently taken from you, at least

6   in my view.

7           MR. WALTERS:  I want to back up to this

8   thing because what was taken permanently in Kaiser was

9   the right to exclude others. How that was going to be

10  taken, as the Court indicated, people wouldn't be able

11  to use the facilities if they entered the marina.  The

12  public would simply be allowed to paddle over the water

13  and then paddle back out of the pond.  That's our

14  position, Your Honor, is that Kaiser Aetna, as I read

15  it, stands for the proposition that taking the right to

16  exclude others on a transient basis by people paddling

17  across your property amounts to a taking.

18          I see the Court doesn't agree with that

19  analysis.

20          THE COURT:  The United States government

21  from Kaiser Aetna permanently took the right that these

22  people had to use the development that they created to

23  charge people for it.  It was permanently taken away

24  forever.  They couldn't do it.  This is a statute that's

25  consistent with the common law that allows people to

1    come on and survey your property.  I think Kaiser Aetna

2    is distinguishable because of the permanence. I think

3    Causby is distinguishable because of the permanence.  I

4    think Loretto is distinguishable because of the

5    permanence.

6              Is there one case that you can cite where a

7    Court has held that a survey statute like this

8    constitutes facially a violation of the Fifth, Fourth or

9    Fourteenth Amendment?  One case in the United States.

10             MR. WALTERS:  I'm unaware of a case that

11   says a survey statute like this makes no requirement of

12   condemnation proceedings is --

13             THE COURT:  You're ducking my question.  My

14   question is this.  Has there ever been a Court in the

15   United States of America to hold a survey statute is --

16   gives a utility the right to come in to a property just

17   to do a survey, is a taking under the Fifth Amendment,

18   is an unreasonable seizure under the Fourth Amendment or

19   a violation of procedural due process under the

20   Fourteenth Amendment?  And the answer to the question is

21   there is none.  There's never been a case that holds

22   that.

23             MR. WALTERS: Your Honor, I'm not trying to

24   duck the question.  I'm trying to make sure I answer it

25   carefully, which is perhaps what lawyers do.

1          THE COURT:  There's never been a case in

2     which a Court has held the way you want me to hold; that

3     this survey statute violates the Fifth, the Fourteenth

4     or the Fifth Amendment of the U.S. Constitution.

5     There's not been one decision you can cite that supports

6     that; is that correct?

7          MR. WALTERS:  Other than the California case

8     that's on appeal, Your Honor.

9          THE COURT:  As applied.  I limited my

10    question to a facial challenge.  That's an as applied

11    case. There aren't any.  And there's been dozens of

12    cases cited by other courts -- granted, not Federal

13    Courts -- but state Supreme Courts, which say these

14    statutes don't give rise to a constitutional violation.

15         So my question is this, Mr. Walters.  Aren't

16    you asking me to break new ground?

17         MR. WALTERS:  No.  You may not like my

18    answer any different than when I tried to give it a

19    couple minutes ago, because I don't see grounds either

20    way here that's being broken, Your Honor.  The statutes

21    say, as many of these statutes do, the entry of survey

22    statutes cited by the defendants --

23         THE COURT:  Every state has one.

24         MR. WALTERS:  Most of them say antecedent to

25    a condemnation proceeding.  The fact patterns when you

1    read them talk about pending positions or applications

2    that are going to be filed.  This statute is permanent.

3    It doesn't say for the next six months or whatever.  It

4    says in perpetuity.  Natural gas companies can come on

5    your property if they meet these following criteria.

6    Sure, on any given occasion, it may be more or less

7    days. We're getting a little bit into as applied.

8    There's no requirement there be condemnation

9    proceedings, that there be a pipeline, that there be

10   anything like that.  I think that is why this is not

11   breaking new ground.

12             THE COURT:  But that's inconsistent with

13   your own pleadings. Your own pleadings say the whole

14   point here is to do this pipeline.

15             Let me ask you a different question. I

16   understand your point.  I understand your point.

17             You don't plead a state action at all in

18   this document and don't I have to dismiss it because

19   1983 requires state action? It's not pled.  There's not

20   one word about state action in this complaint.  I've

21   read it.  My question to you is could you point me out

22   where you pled state action in this case?

23             MR. WALTERS:  Sure.  I did not plead the

24   conclusion of state action.  I pled a private party that

25   is exercising powers is traditionally the sole province

1    of the sovereign, which is the right to take, to come on

2    your property and use it for their business purposes.

3              THE COURT:  Ah, interesting.  Paragraph 35.

4    You say Dominion may exercise the power of eminent

5    domain to acquire private property for the project only

6    after receiving a certificate for public needs.

7              So, doesn't that mean in paragraph 35 that

8    you say that the Dominion Transmission company only is a

9    state actor acting pursuant to eminent domain?  Because

10   you say in another part of your argument, there's no

11   eminent domain.  Isn't therefore de facto no state

12   action? I'm trying to understand what you're pleading.

13             MR. WALTERS:  Sure.  I understand that's

14   Dominion's argument. My position is this --

15             THE COURT:  That's what you said.  You said

16   in paragraph 35, they can exercise the power of eminent

17   domain, and that's the only place in here that seems to

18   me at all to suggest any state action.  You say they get

19   their right pursuant to eminent domain.  That's the

20   state action.  But we're way before eminent domain here.

21   Therefore, I don't see where you pled state action.  So

22   don't I have to dismiss this complaint?  The question is

23   whether I give you leave to amend.

24             MR. WALTERS:  I would certainly request

25   leave to amend, Your Honor.  I would not think the Court

1    has to.  Again, I will try to answer the Court's

2    question.  Whether I answer it satisfactorily or not

3    remains to be seen, that what the defendant is doing,

4    coming upon property, asserting it has the right to do

5    so pursuant to a particular statute, that right of a

6    private person to come on my property, again, as in this

7    case, for a utility project, exists in only one way.

8    That's the sovereign's right to take property for public

9    use, provided compensation is paid.

10            Eminent domain, and perhaps I was a little

11    too cute, I used in the sense of eminent domain

12    proceedings, there are statutes and there are

13    regulations that govern how you exercise that right.

14    That right they are exercising to come on my property

15    and do this, which I as a private citizen would have no

16    right to do, exists only through their stepping into the

17    shoes of the sovereign.  It's the 21st Century and the

18    sovereign doesn't supply natural gas anymore.

19            THE COURT:  Your argument they're state

20    actors and your argument there's no public purpose here,

21    is that argument inconsistent?

22            MR. WALTERS:  No, Your Honor.

23            What they are doing is state action, coming

24    on my property.  To say they have no valid basis for

25    doing that doesn't make it -- how convenient.  Whenever

```
1    it turns out there's no constitutional basis for doing
2    it, it's not constitutional because their basis for
3    doing it was an improper basis.  What they are doing is
4    condemning the property.  They aren't using eminent
5    domain proceedings. I did not view them as inconsistent.
6    I'll be the first to say that pretty much every moot
7    presentation of this I have done, I've been asked
8    exactly that question and invited to perhaps articulate
9    that point a little more clearly.  I'm attempting to do
10   that here.
11            What they are doing is what only the
12   sovereign traditionally can do.  That's take away my
13   property rights, provided it compensates me.
14            THE COURT:  What property right are they
15   taking away by surveying?
16            MR. WALTERS:  The right to exclude others
17   from the property.
18            THE COURT:  What Supreme Court case or other
19   case supports the notion that a temporary right to
20   exclude others for the purpose of a survey violates the
21   Constitution of the United States?
22            MR. WALTERS:  As phrased, Your Honor, I'm
23   not aware of one.
24            THE COURT:  I'm not either and I've read a
25   lot of these cases because this is a fascinating issue.
```

1    These cases are really fun because they involve all

2    kinds of -- I mean, the cases I've read -- the chicken

3    and the airplane case and the Hawaii and New York cable

4    TV case.  They involve all kinds of interesting factual

5    issues and I understand the importance of this case. I

6    understand how strongly folks feel about this. I

7    understand about people feeling strongly about their

8    property that they own, that they've paid for and lived

9    on and not wanting these folks to come on it. I

10   understand that.  And that's why I'm spending a lot of

11   time making sure we get this right.

12           Let me ask you another question.  Mr.

13   Raphael argues that any as applied challenge is not ripe

14   because nothing has been taken yet.  What would you say

15   to that? No one's come on your property yet.

16           MR. WALTERS:  The cases we cited in our

17   brief on this point, Your Honor, are Naegele and

18   National Outside Advertising.  You simply pass a statute

19   that says, guess what, in five-and-a-half years, we're

20   taking your billboard and, oh, by the way, we're not

21   going to pay you for it because we gave you an

22   amortization period.  The Fourth Circuit said not only

23   was that ripe the minute that statute was adopted, it

24   was so clear that it was ripe that those of you who

25   waited five-and-a-half years until the action took your

1    billboard were three-and-a-half years too late.  So if

2    the statute says we're taking it, it's ripe when the

3    statute says that it's being taken.  The fact that the

4    government makes no effort to even exercise that right

5    for another five-and-a-half years --

6              THE COURT:  Isn't this different?  Like in

7    Naegele, for example, the billboard case out of Durham,

8    there was a sign ordinance prohibiting these billboards

9    except for along the highway.  They said in that case,

10   we're not going to pay compensation because your

11   billboards are in a different place and the advertising

12   company said, look, you're taking away my ability to

13   economically use my property to put up a billboard.

14             In this case, the statute does provide for

15   compensation.  If there's damage done to the property,

16   then the statute requires payment of compensation.

17             MR. WALTERS:  Your Honor, the statute -- and

18   everybody likes to label things opposing counsel says as

19   some sort of concession, so I'll make sure I just phrase

20   this as a hypothetical thought as I go along.  If you

21   look again -- my senior partner used to tell me, Mr.

22   Walters, please finish one sentence before you start the

23   next one.

24             In the Oglethorpe case, one of the justices

25   who dissent there refers to his dissent in an earlier

1    case, and dissents aren't worth anything other than

2    indicates other judges might perhaps agree with what I'm

3    saying, saying this may all be fine if when the company

4    came in, yeah, here's 100 bucks for surveying.  You

5    determine what the fair market rental value of that

6    right.  If my neighbor said, Neal, I want to have my

7    barbecue on your yard, it's a very nice yard, and I

8    said, fine, pay me 50 bucks, let me have some barbecue

9    and you can use it, there is a value for what's being

10   taken here.  The statute says all we have to pay for is

11   actual damages, which is a term of art, which means if

12   you cut down a tree, figure out the trees you're going

13   to cut down, pay that in first.  I realize that's the

14   dissent.  But there is something being taken, Your

15   Honor.  That's the right of my wife to look out the

16   window in the morning and not see a bunch of guys

17   traipsing across the yard that's her yard, digging holes

18   and she goes out and they say, we're just the gas

19   company, don't mind us.  We all understand there's that

20   very important right to us to keep other people off our

21   property.  There are exceptions to that rule.  Yeah, if

22   the house is on fire, the firemen can come in.  If my

23   son is a felon, the police can come in, but generally

24   speaking --

25                   THE COURT:  But what you're arguing, there

1   are exceptions, but you're ignoring the fact the

2   exception that is contemplated in the statute has been

3   recognized in the common law for more than a hundred

4   years.  And you just want to say the firemen can come in

5   and the police can come in.  But just as those folks can

6   come in, the common law has always allowed this kind of

7   right to survey.  And it makes sense because why would

8   you want to have to go through a condemnation proceeding

9   and put a pipeline in, in a place that's not suited to

10  it?  The reason for the survey is to see whether or not

11  this is even going to work.

12          MR. WALTERS:  This goes back that Virginia

13  has for years said unless you're coming on the quick

14  take way, here's how it works.  File your condemnation

15  case and then get permission from the Court to go on the

16  property.  Whether you label it concession or not, I

17  would completely agree, it is a matter of common sense

18  you don't want to take more than necessary, but that

19  doesn't lead to, oh, it's always constitutional to come

20  in, in advance and do that and it particularly doesn't

21  lead to the conclusion that it's constitutionally

22  acceptable when you're not even going to file a

23  condemnation proceeding. I completely agree if you're

24  going to condemn the property and the quick take statute

25  says that and other courts and other states have said,

```
 1   yes, if you're going to condemn the property, there's

 2   good reason. Again, I don't mean to keep hammering on

 3   Oglethorpe --

 4             THE COURT:  You would agree that if this

 5   statute said the gas company is limited to doing this in

 6   contemplation of an eminent domain proceeding or in

 7   contemplation of a condemnation proceeding, then the

 8   statute would be constitutional.

 9             MR. WALTERS:  Since Your Honor is trying to

10   get a concession out of me --

11             THE COURT:  No, you're making the argument

12   that this case is different because there's no pending

13   condemnation proceeding.  All I'm asking is if this

14   statute said there was a contemplated condemnation

15   proceeding, is the statute similarly unconstitutional,

16   in your view? I'm just trying to understand what your

17   view is.

18             MR. WALTERS:  It was a poor attempt at

19   humor, Your Honor.

20             What I would say, in that case, yes.

21   There's 150 years of case law, precedence that I have a

22   hard time getting around.  That is a fundamental

23   distinction which  -- between McGuire Woods and my firm,

24   I'm sure the Fourth Circuit will decide this at some

25   point, but that's the fundamental distinction to me.
```

1    There are a bunch of cases that say if you're going to

2    be condemning something, yeah, you can -- I might

3    disagree with the reason that's not a taking.  I think

4    the Supreme Court has said that is a fundamental right

5    that cannot be interfered with by the government and the

6    state can't just define it away.  But I would agree

7    there are a lot of cases that say if this is antecedent

8    to condemnation proceedings, then they've ruled it's not

9    a taking.

10           I don't find any case out there that says --

11   that has this statute.  There's no requirement there be

12   a taking.  And we have a fact pattern where there isn't

13   even a taking.  We have a fact pattern where the federal

14   statute says they can't even commence eminent domain

15   proceedings until they have that FERC certificate.  It's

16   not the constitution's problem that a federal

17   bureaucracy is we want you tell us where this is going

18   to go before you have a right to go out and figure

19   exactly where it's going to go.  I think in the era of

20   Google Earth and that kind of stuff, they can get a

21   pretty good enough sense.

22           So, the question, Your Honor, is no.  If

23   this were that case, I would agree I have a fundamental

24   problem.  The reason I filed this case is because this

25   case isn't out there.  There isn't a statute out there I

have found that doesn't even mention eminent domain.  We
have a separate statute that deals if there is going to
be eminent domain.  That's the quick take.  I'm from
Virginia.  We're conservative.  We love our property.
If you ain't doing the quick take one -- actually, you
can't do this in Virginia.  You have to file your
condemnation petition first.  Then you've got to wait
21 days and then come back and ask me for permission to
go on these people's  property.

THE COURT:  But they can't do that in a case
where they have to get regulatory approval from the
FERC.  They can't follow the quick take statute.

MR. WALTERS:  FERC says you can't condemn,
you can't do eminent domain -- let me add something,
Your Honor.  That's, I think, assuming something that's
not in evidence in this case. It's not that FERC doesn't
require you to identify your possible route.  There's no
evidence that FERC requires you to actually go on each
of those properties, do a soil resistivity test and dig
holes and that kind of stuff before you can come to us.
Now, it may be if we get to summary judgment, they say,
here's what we have to do to comply with FERC and our
expert is going to testify they can't provide the
information we need unless we do that, but the federal
statute says they can't do eminent domain until they get

1  the CPCN.  Somebody at least has said, you know what?

2  They can't do that until they do that.  And the state

3  has said, you can condemn without having a survey.

4  Traditional Virginia slow take is exactly that.  I guess

5  because it's slow, they're not worried about, oh, we're

6  going to take more than we need to --

7          THE COURT:  What about ripeness? They have

8  said they're not going to go on this property.  They're

9  going to apply to state court for an order under the

10  statute.  They've not gone onto any property yet.  Why

11  is this claim ripe, and particularly given the fact that

12  you have under the statute the ability to seek damages?

13  You also have a right to go by inverse condemnation. Why

14  is this case ripe?

15          MR. WALTERS: Sure.

16          First off, ripeness is jurisprudential as

17  opposed to jurisdictional.  I'll start at the end of the

18  situation the Court gave us.  I don't think there's an

19  adequate damages remedy here.  That's what Williamson

20  County said.  It's not just is there a damages remedy.

21  Williamson County said -- I should know.  I highlighted

22  it all here. I should be able to find it sooner.

23          THE COURT:  Page 195.  If a state provides

24  an adequate procedure for taking just compensation, the

25  property owner cannot claim a violation of the just

compensation clause until it has used the procedure and
been denied just compensation.

      MR. WALTERS:  It says you can't get your
trespass damages, but you can get actual damages.  The
Daniels case in the Seventh Circuit and a number of
other cases that say if you can't -- what the inverse
condemnation says, in essence, in Virginia is diminution
of the value of the property.  If, in fact, this taking
is a fundamental constitutional right and doesn't
diminish the value of the property, you have no damages
remedy at law.

      THE COURT:  What you're saying is they've
got to, because they're not paying for the right to come
on and survey -- let's assume no damages.  No trees cut
down.  No holes dug.  They're just walking across a
corner of your land, an open field.  Not anywhere near
your house, just an open pasture.  They don't damage
anything. They walk across it.  They shoot their lines
and they do their survey.  You're saying that that
constitutes a taking in that setting and because they
ain't paying for it, it violates Fifth Amendment.

      MR. WALTERS:  Correct.

      THE COURT:  So basically, you're saying in
order to do a survey, the gas company has to come on and
lease your property for a period of time to do the

1    survey.  That's what you're saying.

2              MR. WALTERS:  Sure.  But the dissent in

3    Oglethorpe is saying it as well, Your Honor.

4              THE COURT:  But it's the dissent.

5              MR. WALTERS:  I agree, and it's also a

6    Georgia case that frankly doesn't matter what --

7              THE COURT:  But when you have cases from all

8    over the United States which disagree with what you're

9    arguing, it provides -- this is what the majority in

10   Oglethorpe says.  Thus, we hold that a prospective

11   condemnor is not required to a year of condemnation

12   procedures and constitutional provisions for

13   compensation before making a preliminary entry,

14   although, if it engages in damages, it's got to pay for

15   it.  That's exactly what the statute says.

16              You just want -- you want two things. One,

17   you say they've got to pay some sort of reasonable

18   value.

19              Let me ask you this.  Landowner A.  Gas

20   company comes in and says we want to go across your

21   property for the purpose of seeing whether a pipeline

22   can go here.  Landowner A says no.  And they say, we'll

23   pay you reasonable rental for the day so we can go and

24   survey.  Landowner A says no, there ain't no amount of

25   money under which I'm going to allow you to come across

1    my property.  Let's say the power company comes across,

2    pays a reasonable rental.  Is there a taking in that

3    setting? They're paying something to come across and do

4    the survey.  Is there a Fifth Amendment violation?

5              MR. WALTERS:  Sure.  There's a taking and

6    it's not unconstitutional because they paid just

7    compensation.

8              THE COURT:  So all they have to do in this

9    case is rent their property for a day to do their survey

10   and you've got no claim.

11             MR. WALTERS:  I don't agree, Your Honor,

12   because the Fifth Amendment says the sovereign has the

13   right to condemn my property for a public purpose and

14   we're glossing that because that wasn't in your

15   hypothetical -- provided there's a public purpose and

16   they pay just compensation.  Nobody would have a

17   constitutional claim there because the constitution has

18   been complied with.

19             THE COURT:  This whole case is about, as far

20   as you're concerned, about renting the property to do

21   the survey.  That's what this comes down to, practically

22   speaking.

23             MR. WALTERS:  It comes down to just

24   compensation for the fundamental right to exclude

25   others, yes, sir.

```
 1              I'm trying to think of the name of the case.

 2    First Amendment rights.  There's no economic value to

 3    your First Amendment right, but it has a fundamental

 4    value which the Constitution protects.

 5              I want to back up for a moment because the

 6    Court quoted before the majority in Oglethorpe and

 7    pointed out again what I think makes our point, Your

 8    Honor, is a prospective condemnor and the Court then

 9    goes on to explain in great detail about why when

10    there's going to be condemnation, this sort of pre-take

11    sort of makes sense. There's ultimately going to be a

12    hearing. Why have two hearings when you're only going to

13    need one?

14              THE COURT:  That's not what this Court says.

15    This Court says there's no taking there.  There's no

16    taking there.  The taking only happens later.  All

17    they're doing is coming on the property to see and that

18    has been well recognized in the Commonwealth and these

19    statutes.

20              Anything else you'd like to say?

21              MR. WALTERS:  No, sir.

22              To the extent the Court lets me --

23              THE COURT:  I'll let you respond to what

24    they have to say.

25              Mr. Wilburn, anything you have to say?
```

```
 1                MR. WILBURN: Just briefly, Your Honor.
 2                THE COURT:  Mr. Walters talks about the
 3     statutory scheme here is very different from the
 4     statutory scheme involved in the quick take and these
 5     other Virginia statutes.  Could you respond to that
 6     argument?
 7                MR. WILBURN:  Yes, Your Honor.
 8                It's an inaccurate statement as to both the
 9     Virginia statutory scheme and what exists at the federal
10     level under the Natural Gas Act.
11                Counsel is correct there's both a quick take
12     process in Virginia.  It doesn't apply to interstate
13     natural gas companies like us. It has no application to
14     these facts.
15                There's a slow take process under state law.
16     It has nothing to do with the survey issue.
17                THE COURT:  Don't you think they should pay
18     some reasonable value for going across people's
19     properties to do these surveys? He says I wouldn't have
20     a claim if the gas company would come and pay us a
21     certain amount of money to do a survey.  Why couldn't
22     you avoid all of this by just paying some reasonable
23     amount to go across their property?  Then there would be
24     just compensation.
25                MR. WILBURN:  Well, sort of getting outside
```

1    --

2              THE COURT:  Maybe you could settle this case

3    by doing that.  Maybe you can resolve it if you pay them

4    a little bit of money.  It ends the issue.

5              MR. WILBURN:  I would love it if we can

6    resolve it.  I can tell the Court outside of the

7    pleadings, this is not about a day's rental value on the

8    property.  It's not.  This is a no, the project's not

9    coming. That's why we're litigating this here and

10   elsewhere.

11             THE COURT:  I understand this is the first

12   skirmish in an issue that is near and dear to people's

13   hearts and lives.  I understand that.  I understand

14   that.  It is the very first skirmish.  I understand

15   that.

16             But this Court is not dealing with the issue

17   of whether a pipeline can come across their property.

18   This Court is not dealing with an issue about whether

19   there's a public need for this. This Court is not

20   dealing with an issue about whether the pipeline goes

21   here or there or there.  This Court is not dealing with

22   any of those issues.  Those aren't before me. The

23   reasonable issue I'm dealing with is whether the law

24   that allows a natural gas company to go on your property

25   on a temporary basis, conduct a survey, violates the

1    Constitution of the United States. Understand the very

2    limited thing I'm dealing with.  I'm not dealing with

3    the issue about whether it's right or wrong to build a

4    pipeline in a certain place.  Those issues will be dealt

5    with by other people other than me.  The only issue is

6    whether or not this temporary access to the property,

7    without compensation, where there's no damage to the

8    property, violates the Fifth Amendment because it's a

9    taking without compensation.  Or it is an unreasonable

10   seizure under the Fourth Amendment?

11             You sit down.

12             I have to ask you a question.  I just want

13   to ask your position on this.

14             Let's say for the sake of argument -- I'm

15   going to come down there.

16             (Court left the bench).

17             Let's say just for the sake of argument

18   you've got this piece of property.  And this may be just

19   a silly question.  But you've got a piece of property

20   and let's say this is the Klemic property and it goes

21   like this and these are other people's properties.  The

22   pipeline company comes right here and puts their transit

23   and they come right here and put their transit and shoot

24   the line across the corner of the Klemic property.  They

25   don't physically enter it, but they shoot their transit

1  across it.

2          Do you believe in that situation there's an

3  unconstitutional taking?

4          MR. WALTERS:  Not unless there are any

5  chickens killed in the process.

6          THE COURT:  Sending the transit over the

7  property wouldn't do it.

8          MR. WALTERS:  The transit is the physical

9  device that sits there. No, people can look across

10 property.

11         THE COURT:  So what's the difference then

12 between them putting the little transit right there and

13 just walking up and running the transit between here and

14 there?  What's the difference, in constitutional terms?

15         MR. WALTERS:  Sure.  Well, that would be a

16 trespass.

17         THE COURT:  The statute says it ain't a

18 trespass.

19         MR. WALTERS:  Starting with the

20 Commonwealth, there's a trespass. If you have a valid

21 statute that gives somebody the right to walk across

22 your property without permission, then there's no

23 trespass. If there's a statute that's unconstitutional

24 that gives them a right to cross across your property,

25 then there's a Fifth Amendment violation because it's

1  taking my right to enjoy my property.

2          (Court resumes bench).

3          THE COURT:  It's just the walking across.

4          MR. WALTERS:  Right.

5          In this case, Your Honor -- again, I resist

6  wholeheartedly using survey as -- I like Oglethorpe for

7  various reasons, but it goes on to say this kind of

8  innocuous entry is what we are saying is not a taking.

9  It spends a whole paragraph saying how minor this has to

10  be.  It doesn't talk about a 100-acre parcel with a

11  200-foot wide swathe with holes being dug every 50 feet

12  in it.

13          THE COURT:  Justice Oliver Wendell Holmes,

14  in 1922, in the Pennsylvania Coal vs. Mahone case,

15  answers that question.  He's talking about in that case

16  a regulatory case.  He says if the regulation goes too

17  far, it was recognized as a taking. If there's taking,

18  there's just compensation required.  If they come on the

19  property and they damage trees; if they come on the

20  property and because there's some suggestion of a

21  historic site or a cultural artifact that they need to

22  look to see whether there's been Native Americans there,

23  they look to see whether or not there's been Civil War

24  there, they have to pay for that.

25          You're saying just the coming on in and of

1    itself violates the Constitution.

2              MR. WALTERS:  That's also what <u>Kaiser Aetna</u>

3    says.  Simply paddling across there violates the

4    constitution.

5              I realize the Court doesn't agree with me.

6              THE COURT:  I'm sorry.  I asked this

7    hypothetical about just the transit because I wanted to

8    know the limits of your argument.  I appreciate that.

9              I'll ask Mr. Wilburn to stand up and I'll

10   give you a chance to respond, Mr. Walters.

11             Mr. Wilburn, go ahead.

12             It's a fascinating case and an important

13   case. It's important to the parties.  It's important to

14   the Commonwealth.  It's important to Dominion

15   Transmission and it's important to these landowners.

16   And I'm going to give it the importance to which it is

17   due. I spent a lot of time on this case.

18             MR. WILBURN:  Thank you, Your Honor.  Just a

19   couple points.

20             Counsel relies on the dissent in Ogletree

21   (sic), and it's exactly that, a dissent.  There's not a

22   case that's been cited by the landowners in this action

23   in which a temporary intrusion --

24             THE COURT:  He says, wait a minute. All

25   those other statutes contemplate eminent domain or an

1    impending eminent domain proceeding and those statutes

2    are different because this statute doesn't require that.

3            MR. WILBURN:  That's just inaccurate and

4    there's not a case that says that either. But even if it

5    were accurate --

6            THE COURT:  It's a novel argument Mr.

7    Walters is making.

8            MR. WILBURN:  It's a novel argument and it's

9    interesting.  It's novel, but it's not supported by any

10   case law or any of the statutes he's relying on.

11           If you look at the statute at issue in this

12   case, there's no requirement in any case that a survey,

13   that entry for survey is antecedent to a condemnation.

14           THE COURT:  Oglethorpe, just to his point.

15   We hold that a prospective condemnor.  He says because

16   there's no condemnation, because you're not a

17   prospective condemnor and condemnation or eminent domain

18   is not imminent, that these cases are not on point.

19           MR. WILBURN:  I think a reading of all the

20   cases, there's not a case among those that says the

21   survey has to be part of a condemnation, which is the

22   argument that's made.

23           If you look at the statute itself, if you

24   want to sort of delve into that issue, 56-49.01

25   incorporates in its very first sentence, 15 U.S.C. 717A,

1    I believe the citation -- I don't have it with me, but I

2    believe the condemnation portion of that statute is

3    717H. So, the idea this project may not ultimately

4    result in a condemnation is farfetched.   The

5    condemnation power is contained in the same statutory

6    cite that's embedded in 56-49.01.   It's either G or H.

7    I don't have it with me.

8              What it simply provides is where the gas

9    company and the landowner aren't able to agree on the

10   conveyance of the easement that they have the power of

11   eminent domain.

12             The other sort of fundamental problem,

13   counsel criticizes the federal regulatory scheme on this

14   by suggesting it's not the Constitution's problem that

15   these surveys are necessary in order to obtain the CPCN.

16   That's a well-settled body of law on this issue.   We

17   cited in our brief.   That's 18 CFR 157, 360, 380, and

18   there are others.   Those are just examples.   That

19   authorize or require the exact type of surveys we're

20   asking for in this case, which I think really are

21   helpful about the statute that counsel is challenging.

22   It incorporates the Natural Gas Act.   It specifies the

23   purpose for the surveys, which are those required by

24   regulation, and that's those in the CFR's that we cited.

25   And the Natural Gas Act actually includes a component

1    for eminent domain. So, that argument is not supported

2    by any law.

3                THE COURT:  You're saying his argument that

4    there's no contemplation of eminent domain is undercut

5    by the fact the Virginia statute itself references the

6    Natural Gas Act.

7                MR. WILBURN:  It incorporates the Natural

8    Gas Act, which in that very citation --

9                THE COURT:  Or is it just incorporating the

10   definition of a natural gas company as set forth in 14

11   U.S.C. 717A?

12               MR. WILBURN:  I think you can argue it

13   either way, but when you're looking at the construction

14   of the statute, the Court is constrained to try and

15   construe it in a way that's constitutional.  However you

16   turn the statute around and look at it, I think counsel

17   is speculating as to ways in which if something is not

18   in the statute happens, it would be a problem. But the

19   Court's obligation --

20               THE COURT:  I think he mentioned in his

21   brief building a road for a resort.

22               MR. WILBURN:  Right.  That's not allowed.

23   That's on the face of the statute.  It's to satisfy a

24   regulatory requirement. It's not a regulatory

25   requirement that allows us to build a resort on the road

1    to the beach, which was what was suggested.  So setting

2    up straw men to suggest to the Court there's some

3    scenario out there under which --

4              THE COURT:  Mr. Walters, I want you to make

5    a note because I want you to address that reference,

6    too.

7              MR. WALTERS:  I just made a note right here,

8    Your Honor.

9              THE COURT:  I want to hear what you have to

10   say about that.

11             MR. WILBURN:  Counsel is suggesting there's

12   some circumstance where Dominion might violate the

13   statute, rendering it unconstitutional, but it doesn't

14   work that way.  The statute is either facially

15   constitutional or not.  It has to be read in a way, if

16   at all possible, if any reasonable meaning could cause

17   it to be constitutional, Your Honor has to find it as

18   such, and the plain long would be constitutional,

19   consistent with the case law. Everything else is

20   speculation that Dominion would do something not allowed

21   by the statute.  In that circumstance, the privilege

22   doesn't attach and there would be a liability.

23             I think it's noteworthy -- I won't go so far

24   as to say a concession, but I think it's noteworthy that

25   counsel recognized that list of exceptions that's set

1    forth in the treatise and in the Restatement and in

2    common law, 15 or 20 exceptions to the right to exclude

3    recognize they exist and the only one that he says

4    doesn't exist without authority is the one we're at

5    issue on today.  And it's simply inconsistent.

6              In terms of the permanency issue, Your

7    Honor, there was talk of Lucas and talk of Loretto and

8    these others. Embedded right in the language of the

9    Supreme Court is the reference to permanency. There's

10   not a case out there, there's not a case anywhere in

11   which a temporary intrusion on the right to exclude is

12   compensable.

13             The last thing I'll say on this, unless Your

14   Honor has a question --

15             THE COURT:  The Fourth Circuit in -- I can't

16   think of the name of the case -- hold on.  It's Presley.

17   That's a temporary case.  It cites Place, Fourth

18   Circuit, for the proposition that rather the Fourth

19   Amendment often governs temporary or partial seizures

20   and cites U.S. vs. Place. That doesn't have anything to

21   do -- there's nothing about the facts of Place that have

22   anything to do with our case. That's a case where they

23   searched some luggage somebody had on a bus and they

24   found some contraband and there was a prosecution. The

25   only thing that that case stands for is the notion an

1   intrusion on possessory interest can vary.  You have to

2   look at the nature and effect.  What's the possessory

3   interest in?

4          They cite the <u>Pepper</u> case. That was a case,

5   interesting case, out of Seventh Circuit in which there

6   was this couple that was living in an apartment and she

7   was at work and he says -- and they had had a falling

8   out and he wanted to go to the apartment to get his

9   stuff out of the house and they had the police go along

10  so that there was state action. He takes his stuff, but

11  he also steals her television and he takes a knife and

12  rips up her couch.  Rips it up.  The Court found there

13  in that case that there was a permanent stealing of the

14  TV and a ripping up of the couch.  So it wasn't just a

15  temporary thing.

16          We've talked about the <u>Gray</u> case also cited

17  by the Fourth Circuit and that is the rifle case.

18          Anything else you want to add?

19          MR. WILBURN:  Yes, Your Honor.

20          I point to the <u>Montana Company against St.</u>

21  <u>Louis Mining and Milling</u>. This is a U.S. Supreme Court

22  decision.  It's not an entry for survey statute, but in

23  reaching a decision on this case allowing a survey

24  without compensation, they cited with approval the

25  Massachusetts Supreme Court that had found entry for

1    survey constitutional.  What the Court held is that if

2    occupancy was reasonably necessary for some purpose, if

3    it's temporary and there's no unnecessary damage -- I'm

4    paraphrasing -- it carried no right to compensation.

5             That's a case where a Court ordered an

6    inspection of mines, a survey of mines to resolve

7    competing claims.  It's not our fact pattern, but one of

8    the mine owners argued that that violated their right to

9    exclude.  It was a compensable, constitutional right and

10   the Court disagreed.  That's similar to what we have

11   here. I would --

12            THE COURT:  That was around the turn of the

13   last century.

14            MR. WILBURN:  It was, but it really

15   recognizes, I think, how long this body of law has been

16   in place.

17            Counsel's argument, he said it several

18   times, is based on, and I wrote it down, his belief that

19   there's a fundamental right to exclude utilities for

20   surveys.  The problem with that position is it supports

21   all of his claims and it's unsupported in the law.

22   There's no case that says that.

23            The last thing I'd suggest to Your Honor,

24   I'd ask you to take up -- I guess the state actor issue

25   is an important one. One of the concerns we have with

1  the inconsistent pleading the plaintiffs have made is

2  there's, obviously, I think, sort of an easy way out,

3  which is to sustain the motion to dismiss because they

4  haven't used the words to plead state actor.  But that

5  arguably doesn't resolve the facial challenge which is

6  so important to Dominion and the people here --

7             THE COURT:  I'm going to take it up.  I

8  thought about just saying he hadn't properly pled state

9  action and therefore, I could just dismiss it and give

10  him leave to amend, without addressing the taking,

11  without addressing the unreasonable seizure, without

12  addressing the Fourteenth Amendment.  I'm going to deal

13  with all those on the facial challenge to the statute.

14             He raises an interesting claim and I will

15  deal with the claim on the motion to dismiss and we'll

16  see what goes from there.

17             MR. WILBURN:  Thank you.

18             Do you have any other questions?

19             THE COURT:  No.

20             Mr. Raphael, do you want to say anything

21  else?

22             MR. RAPHAEL:  On the state action piece of

23  it, I appreciate your last remarks. It's pretty clear he

24  could amend to add a declaratory judgment action.

25             THE COURT:  He could amend, I think, but it

1   seems to me that all that would be doing is kicking this

2   can down the road a little bit.  I think the Court

3   should deal with the issues that are raised.

4           MR. RAPHAEL:  That's exactly right.

5           THE COURT:  Whether I do that because I

6   don't think he's properly pled state action or whether I

7   deal with it through the lens of an amendment would be

8   futile or not futile under <u>Foman vs. Davis</u>, I could do

9   that.  I'm going to look at the merits of the challenge

10  to the statute and write an opinion making a judgment on

11  this and the case will either go forward if I deny the

12  motion to dismiss.  If I grant the motion to dismiss,

13  there's this group in Richmond that reviews what I do

14  and decides whether or not I make error.

15          MR. RAPHAEL:  Thank you, Your Honor.

16          With regard to the issue there's really no

17  difference between a facial and an as applied challenge,

18  there's reference to Chief Justice Roberts on that and I

19  think the most recent salient case on that point is <u>Doe</u>

20  <u>vs. Reed</u>, which is 561 U.S. 186.

21          THE COURT:  561 U.S. 186.

22          MR. RAPHAEL:  The Court discusses what some

23  justices have suggested, that there may be grey areas

24  between a facial and an as applied challenge.  But I

25  think the salient language is at page 194 where the

```
1    Court says --
2               THE COURT:  Hold on a second. Let me pull
3    that up.
4               Go ahead.
5               MR. RAPHAEL:  I don't have the page in front
6    of me, but the text is that the label is not what
7    matters.  The important point is that plaintiff's claim
8    and the relief that would follow, dot, dot, dot, reach
9    beyond the particular circumstances of these plaintiffs.
10   They must therefore satisfy the Supreme Court standards
11   for a facial challenge to the extent of that reach.
12              The teaching of this is that if you were
13   trying to argue the statute is unconstitutional on facts
14   beyond you, which is what they're claiming, it's
15   facially invalid, you have to satisfy the standard for a
16   facial challenge, which is it has to be unconstitutional
17   in every application.
18              The suggestion was made that ripeness is not
19   an Article III issue, it's just a prudential matter.  I
20   don't believe that's right.  Ripeness is really the
21   concept of standing in time.  If the claim is not ripe,
22   they would be asking the Court to decide a matter that
23   is not a case or controversy yet because the facts are
24   not yet presented.  He may be confusing the idea that
25   you can have an exception to the mootness doctrine when
```

1    a case is capable of repetition yet evading review.  But

2    I believe ripeness is an Article III requirement.

3              The suggestion was made that this statute is

4    different because there's no actual condemnation, and

5    there may not be one.  At page 17 of our brief, we set

6    out, at the top of that page, footnote 63 through 65,

7    the cases that deal with this notion of gee, what if you

8    decide you're not going to take the property, does that

9    make a difference? The answer is that it doesn't.  For

10   example, as the Court said in the Indiana Court of

11   Appeals, Indiana Michigan Electric Company vs.

12   Stevenson, footnote 64, that the utility will not be

13   forced to engage in a wasteful expenditure of the

14   rate-payer's money by blindly purchasing a pig in a

15   poke, which is what you'd have to do if you have to buy

16   the land to survey it, not knowing whether you needed to

17   take it or not.

18             We also cited the North Dakota Supreme

19   Court's opinion in Square Butte Electrical Cooperative,

20   where the Court said that requiring the utility to prove

21   prior to committing its survey and test that the land's

22   best route would be to require it to act prior to the

23   ascertainment of knowledge necessary to establish such a

24   fact and might result in a useless act.

25             Perhaps some of the best language on this

1   point comes from the Supreme Court of New Hampshire's

2   decision in that really old case, Orr vs. Quimby, which

3   is 1874.   At page 598, the Court said -- and this was

4   responding to the notion you'd have to pay for damage

5   that might occur before you go on the land to survey it.

6   The Court said at page 598, the practical effect of

7   holding the defendant could not enter upon the

8   plaintiff's land for the necessary purpose of the coast

9   survey or that he could not do any substantial entry

10  thereafter he had entered without previously paying or

11  securing him for the damage that he caused would be to

12  deny the right all together.

13          The point the Court made, and there's other

14  language to this effect, it would be completely

15  impractical to require a utility to pay to survey land,

16  pre-condemnation.   You would effectively destroy the

17  right all together.

18          The issue of the Montana case came up.

19  That's an 1894 case, the U.S. Supreme Court case, the

20  mining case. We cited that in our papers.   That's a

21  really good citation. I completely agree with my counsel

22  on Dominion for that.

23          I would point out, Montana, if you want to

24  address this in your opinion, Montana was followed by

25  the Fourth Circuit in Belcher vs. Bassett Furniture.

1   This is footnote 26 of our brief.

2           THE COURT:  I looked at that Bassett

3   Furniture case.

4           MR. RAPHAEL:  The point was a Court order

5   that requires somebody to go on someone's land is not a

6   taking because there's not a right to exclude in that

7   situation.  So it's another application of the principle

8   that you don't have a right to exclude in all

9   situations.

10          Kaiser Aetna.  Mr. Walters tried to make the

11  argument that Kaiser Aetna applies, and I know you're

12  all over on this one.  I would just cite at page 180 of

13  Kaiser Aetna, the Court points out if the government

14  wishes to make what was formally coop a pond into a

15  public aquatic park after petitioners have proceeded as

16  far as they have here -- they turned it into a marina --

17  without invoking its eminent domain power and paying

18  just compensation, requires them to allow free access to

19  the dredged pond while petitioner's agreement with the

20  customer calls for an annual $72 regular fee.  So they

21  did all this work to build a pond. They charged $72 to

22  customers and the government took that away by saying

23  anybody can use it without paying.

24          THE COURT:  And they took it away

25  permanently.

```
 1              MR. RAPHAEL:  That's exactly right.

 2              THE COURT:  By imposing a navigational

 3   servitude on it.

 4              MR. RAPHAEL:  That's exactly right.

 5              You asked Mr. Walters to answer a question

 6   and he made a note on that. I suggest the Court ask him

 7   the other question I mentioned earlier.

 8              THE COURT:  Page six of his brief?

 9              MR. RAPHAEL:  Yes.

10              Is it his position that the other entry for

11   service statutes are unconstitutional under his theory

12   of the right to exclude? He's hedged on that.

13              THE COURT:  Well, we'll ask him.

14              Can you make a note of that one, too, Mr.

15   Walters? We'll ask you that one, too.

16              MR. RAPHAEL:  We greatly the appreciate the

17   attention you've given this and a written opinion will

18   go very far, I think, in clarifying the law in this area

19   and confirming the law in this area.

20              THE COURT:  At least until the Fourth

21   Circuit decides it.

22              MR. RAPHAEL:  I would urge the Court to

23   focus on the issue of the common law right to exclude

24   under the Virginia law, common law under Virginia law.

25   There just isn't one in this context.
```

1           THE COURT:  Until yesterday when I was

2  looking at your appendix, I did not know something --

3  well, there are a lot of things I don't know, but I

4  really didn't know this. I didn't know there was a law

5  school in Winchester.  There's a -- this Henry St.

6  George Tucker thing that you put in here that I found,

7  it was an address he made at the Winchester School of

8  Law.  I just have to find the page.  Commentaries of the

9  law and the laws of Virginia comprising the substance of

10  a course of lectures delivered to the Winchester Law

11  School by Henry St. George Tucker, Fourth Judicial

12  Circuit, and that was published in 1846, which I did not

13  realize that there was a Winchester Law School.

14           Just another fascinating nugget we get to

15  look at in this case.

16           MR. RAPHAEL:  I didn't know that either.

17  Professor Hamilton Bryson told me the other day that the

18  Henry St. George Tucker treatise is the first one that

19  was a treatise about Virginia law specifically.  I

20  thought that was interesting.

21           THE COURT:  You can't go to law school in

22  Virginia without hearing Henry St. George Tucker.

23           MR. RAPHAEL:  I think he was the grandfather

24  of the father of the Tucker Act in Congress.

25           If the Court has no further questions --

```
 1                    THE COURT:  We have at least two questions
 2      for Mr. Walters.
 3                    MR. RAPHAEL:  Thank you, Your Honor.
 4                    THE COURT:  Answer Mr. Raphael's question
 5      about, do you believe these other entry for service
 6      acts, other than the one at issue here, are likewise
 7      unconstitutional?
 8                    MR. WALTERS:  Without knowing the specific
 9      one referring to at this point, if that statute provides
10      a right to survey that is not antecedent to a
11      condemnation proceeding, our argument would be the same,
12      Your Honor, yes.
13                    THE COURT:  I understand your point on that.
14                    MR. WALTERS:  I'm not trying to be devious
15      or inconsistent.
16                    THE COURT:  You just don't have them off the
17      top of your head.
18                    MR. WALTERS:  Right, but our argument would
19      be the same.  If it allows them to come on not requiring
20      compensation for a public purpose, our argument would be
21      the same.
22                    THE COURT:  What about the reference in the
23      statute Mr. Wilburn made to the Natural Gas Act, 717A?
24                    MR. WALTERS:  Well, Your Honor, it doesn't
25      incorporate the Natural Gas Act.  What it says is any
```

1   firm, corporation or partnership organized for the bona

2   fide purposes as operating as a natural gas company as

3   defined in 15 -- it's just saying we're using this term

4   natural gas company. What it means is the same

5   definition as in another statute.  There's no rule of --

6   whether I borrowed that, I have incorporated that. Not

7   only that section, but all the other sections, whatever

8   Acts I'm borrowing the definition from.  So, the answer

9   to that one is easy.  We're using this definition, this

10   name, this term and it just means the same thing it

11   means in other statutes.

12        THE COURT:  Look at the first line of the

13   statute.  Any firm, corporation, company or partnership

14   organized for the bona fide purpose of operating as a

15   natural gas company.  What are those purposes? They

16   deliver natural gas. How do they deliver it?  Through

17   pipes.  Doesn't that, by definition, talk about exactly

18   what you're talking about in this case? They've got to

19   put the pipe somewhere.  Natural gas doesn't just fly

20   around.  It goes through pipes.

21        MR. WALTERS:  Let's continue reading the

22   statute, Your Honor, because I don't mean to be pedantic

23   there.  What it says is the company defined in that way

24   may make such examinations, tests, hand auger borings,

25   appraisals and surveys -- so it's not just a survey

1    statute -- for its proposed line or location of its

2    works as are necessary, one, to satisfy any regulatory

3    requirements; and two, and it lists a whole bunch of

4    other reasons you can do it -- for the selection of the

5    most advantageous location or route, the improvement or

6    straightening of its line or works, changes of location

7    or construction or providing additional facilities.  And

8    sure, I pick some hyperbolic example, you know, if they

9    want to construct a road to their beach side thing.  But

10   saying to provide additional facility is pretty

11   open-ended, Your Honor.  It doesn't tie it to facilities

12   related to just your natural gas pipeline.

13           THE COURT:  Mr. Raphael argues you have to

14   look at the statute the other way.  When I'm doing the

15   facial challenge, I have to look at it and say -- you're

16   arguing that I have to look at it and say, well, it's

17   too broad and providing additional facilities is

18   undefined. He says if there's any way to view it as --

19   if there's any scenario under which it's constitutional,

20   I have to uphold it.

21           MR. WALTERS:  Sure.  And typically, what the

22   courts do then is write an opinion saying here are the

23   limitations I'm writing into the statute.  So, to go

24   back to the Court's first question, if Your Honor wrote

25   an opinion that says I'm interpreting this statute as

saying surveys antecedent to eminent domain proceedings for the purposes of determining what property to take in that eminent domain proceeding and subject to damages, remedy for any damages caused, that's how I read the statute, you're right.  I'd pretty much say that answers the concerns we're addressing in this case.

Correct, the Court could construe it more narrowly, but its decision must set out the way in which its considering that.  Again, if you get to the point where you're making an entirely different statute, particularly if it's a federal court reviewing a state statute and saying, well, I'm going to take a blue pencil to this one until I get to something that survives the Constitution, certainly is the Court can do whatever it wants in that respect.  But I think it's not the same as saying, oh, if I can come up with any scenario where this might be plausible, I'll just say the statute as written is fine.

THE COURT:  I understand that argument.

MR. WALTERS:  I come from Fairfax.  My accent may be hard to understand sometimes.  I don't recall ever saying there's a fundamental right to exclude utilities.  I said there's a fundamental right to exclude others from the property.  That's not me.  That's the Supreme Court saying that.

```
 1              Again, if this were antecedent to
 2   condemnation -- nobody needs to by a pig in a poke.  Nor
 3   does the General Assembly that says if it's a slow take,
 4   here's how you do it.  You've got some time. Make sure
 5   you don't take too much.
 6              One last thing on the 12(b)(6) issue, Your
 7   Honor, is what may be out there about what they have to
 8   do and how they comply, if that's in fact all this case
 9   is going to be about is this very narrow as applied
10   thing is the fact this Court doesn't have yet.
11   Regulations may say we need certain things.  There's no
12   evidence, certainly nothing pled in this case about what
13   method needs to be used to get there.
14              One final, final point, Your Honor, is a
15   distinction I would suggest is critical; the distinction
16   between temporary and intermittent.  What Kaiser Aetna
17   and Causby deal with are situations where the intrusion
18   is intermittent, four percent of the time for a matter
19   of seconds, seven percent of the time for a matter of
20   seconds in Causby, and whenever people may in the future
21   choose to enter, in Kaiser Aetna.  Intermittent and
22   temporary in the Fifth Amendment sense are not the same.
23   It's if that intermittent taking continues indefinitely,
24   that is a permanent taking and that's what 56 says.  It
25   says any of these statutes will be intermittent.  It may
```

1    be a day or a matter of days, but the statute says you

2    can continue to do that forever as long as you meet the

3    criteria in this statute.  It's not, oh, come on Mr.

4    Walters, you're just going to be there for a day.  They

5    may have said we need more stuff; or gosh, power

6    failure, we lost our data, we need to do it again; or

7    that was for the pipeline and now we want to straighten

8    it.  Or now we want to build some other facilities to go

9    with that. So it is a statute with no sunset provision,

10   no six-month lease like Causby. It goes on in

11   perpetuity, giving them to right to come on for a day,

12   however many days, over and over again until the cows

13   come home or the chickens die, whatever the analogy is.

14            For those reasons -- well, you know what we

15   want, which is to have the Court rule on the motion and

16   we look forward to reading the Court's decision.

17            THE COURT:  Thank you, counsel.

18            Obviously, you all have done a masterful job

19   of looking at the law, briefing the issue.  I greatly

20   appreciate your arguments. I had a number of questions

21   that I wanted to pose as I looked at the briefs and the

22   law in this case.  Each of you have given me some other

23   things to think about.  Each of you have given me a few

24   other cases to look at and like I said, I'm not going to

25   decide the matter today from the bench.  I am going to

```
 1    issue a written opinion.  I can't find a recent federal
 2    court opinion on this subject going back to the middle
 3    of the 19th century.  So I will write an opinion on
 4    this.  It's an important issue to the parties.  I will
 5    devote substantial effort and study to make sure that at
 6    least as far as I'm concerned that I get it right and
 7    that we're doing justice here and that we're following
 8    the law and I will do that.
 9              I'm not sure exactly how long it will take
10    me to do this, but I will get to it just as soon as I
11    can.
12              I will say it's been a pleasure. I'm not
13    sure I have ever -- you may have argued before me, Mr.
14    Raphael, but Mr. Wilburn, Mr. Walters have been
15    well-prepared and smart and who understand the issues
16    and can help frame the issue for the Court to try to
17    resolve.  Thank you all so much.
18              I'll get a written opinion out just as soon
19    as I can.
20              Is there anything else I can do for the
21    parties?
22              MR. WALTERS:  Nothing from us, Your Honor.
23              MR. WILBURN:  No, Your Honor.  Thank you.
24              MR. RAPHAEL:  Thank you, Your Honor.
25              THE COURT:  Appreciate it.
```

1          Ask the Marshal to declare a recess.

2

3

4

5    "I certify that the foregoing is a correct transcript

6    from the record of proceedings in the above-entitled

7    matter.

8

9

10   /s/ Sonia Ferris                April 16, 2015"

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25