IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| JAMES KLEMIC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 3:14–cv–00041 |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| DOMINION TRANSMISSION, INC., *et al.*, | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Virginia Code § 56-49.01 authorizes a natural gas company to enter private property

without the landowner's written permission and perform a survey for a proposed natural gas

pipeline. Pursuant to this statute, defendant Atlantic Coast Pipeline, LLC (ACP), a joint venture

of defendant Dominion Transmission, Inc., and three other companies, has notified plaintiffs

Joan and James Klemic, Charlotte Rea, and Karen and Peter Osborne that it could enter their

properties and conduct surveys for a new pipeline in the future, but that it has no intention of

doing so now. In an attempt to stop ACP or any other company from entering their properties

for this purpose, plaintiffs filed this action, alleging that the statute, on its face and as applied,

violates the United States and Virginia Constitutions, and is thus void and unenforceable.

Notably, plaintiffs do not challenge, in this case, whether a proposed natural gas pipeline will

traverse Virginia, nor the route of any proposed pipeline.

Defendants now move to dismiss plaintiffs' complaint under Federal Rule of Civil

Procedure 12(b)(1) for lack of subject-matter jurisdiction and Rule 12(b)(6) for failure to state a

claim upon which relief can be granted. The Commonwealth of Virginia, which has intervened

to defend the constitutionality of the statute, also urges dismissal. For the following reasons, the

court concludes that plaintiffs' facial challenges to the statute fail because the statute does not deprive a landowner of a constitutionally protected property right, and that plaintiffs' as-applied challenges fail because they are not ripe. The court will therefore grant defendants' motion and dismiss plaintiffs' complaint.

## I. BACKGROUND

### A. Plaintiffs own properties in Nelson County.

Plaintiffs, either individually or jointly, own properties in Nelson County, Virginia. (Dkt. No. 1, Compl. ¶¶ 7–18.)[1] The Klemics have six parcels, totaling about 196 acres. (*Id.* ¶ 8.) The parcels "contain some cleared fields with the balance in woodland." (*Id.* ¶ 9.) They also contain a number of streams that feed into Rockfish River as well as two Civil War era cemeteries. (*Id.*) The Klemics' house is on one of the parcels. (*Id.*)

Rea owns three parcels, comprising roughly 30 acres. (*Id.* ¶ 11.) She lives on one of the parcels, which is "mostly wooded." (*Id.* ¶ 13.) Her house sits on a raised portion that overlooks a floodplain along Rockfish River. (*Id.*)

The Osbornes have one parcel consisting of approximately 101 acres. (*Id.* ¶ 15.) About half of the parcel contains a mixture of pastures and woodlands, and the rest "slopes up the southwest face of Pilot Mountain." (*Id.*) The portion that runs up the mountain is "heavily wooded with two springs." (*Id.*) A pre-Civil War era slave cemetery is located somewhere on the parcel. (*Id.*) The Osbornes' house is on the parcel. (*Id.*)

---

[1] Unless otherwise noted, the facts recited in this background section and relied upon below are derived from plaintiffs' complaint and documents incorporated into or attached to the complaint. (Dkt. No. 1, ¶¶ 1–25, Compl.; Dkt. No. 1-1 at 1–2, Ex. A; Dkt. No 1-1 at 3–4, Ex. B.) Consistent with the governing standards of review under Federal Rules of Civil Procedure 12(b)(1) and (b)(6), the court accepts plaintiffs' factual allegations as true and construes them in the light most favorable to plaintiffs. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 189 (4th Cir. 2010); *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999).

All of plaintiffs' parcels are posted with "no trespassing" signs and no commercial activity takes place on them.  (*Id.* ¶¶ 10, 14, 18.)

**B.  Dominion notifies plaintiffs of a new pipeline and asks for written permission to enter their properties and conduct surveys for the project.**

In May 2014, Dominion sent a letter to plaintiffs, informing them that the company was planning to build a new 550-mile interstate natural gas pipeline (now known as the Atlantic Coast Pipeline) and that their properties were located within the proposed route.  (Dkt. No. 1, ¶¶ 19–20; Dkt. No. 1-1 at 1, Ex. A.)  To determine the suitability of the properties for the project, Dominion asked plaintiffs for written permission to enter and conduct surveys.  (Dkt. No. 1, ¶ 20; Dkt. No. 1-1 at 1.)  Plaintiffs did not comply with Dominion's request.  (Dkt. No. 1, ¶ 25; Dkt. No. 1-1 at 1.)

**C.  Dominion notifies plaintiffs of its intent to enter their properties without written permission and conduct surveys for the pipeline project.**

The following month, Dominion sent another letter to plaintiffs, this time giving them notice that, although the company had not received written permission to enter their properties, it nonetheless planned to move forward with the surveys for the pipeline project.  (Dkt. No. 1, ¶¶ 20; Dkt. No. 1-1 at 1.)  Dominion explained that, after giving notice, it had authority to enter and perform the surveys under § 56-49.01 (Dkt. No. 1, ¶ 24; Dkt. No. 1-1 at 1), which provides in full:

> A.  Any firm, corporation, company, or partnership, organized for the bona fide purpose of operating as a natural gas company as defined in 15 U.S.C. § 717a,[2] as amended, may make such examinations, tests, hand auger borings, appraisals, and surveys for its proposed line or location of its works as are necessary (i) to satisfy any regulatory requirements and (ii) for the selection of the most advantageous location or route, the improvement or straightening of its line or works, changes of location or construction, or providing additional facilities, and for such purposes, by its duly authorized officers, agents, or employees, may

---

[2] Natural gas companies are federally regulated pursuant to the Natural Gas Act, 15 U.S.C. § 717 *et seq.* Plaintiffs do not dispute that defendants are natural gas companies as defined in § 717a of the Act.

enter upon any property without the written permission of its owner if (a) the natural gas company has requested the owner's permission to inspect the property as provided in subsection B, (b) the owner's written permission is not received prior to the date entry is proposed, and (c) the natural gas company has given the owner notice of intent to enter as provided in subsection C. A natural gas company may use motor vehicles, self-propelled machinery, and power equipment on property only after receiving the permission of the landowner or his agent.

B. A request for permission to inspect shall (i) be sent to the owner by certified mail, (ii) set forth the date such inspection is proposed to be made, and (iii) be made not less than 15 days prior to the date of the proposed inspection.

C. Notice of intent to enter shall (i) be sent to the owner by certified mail, (ii) set forth the date of the intended entry, and (iii) be made not less than 15 days prior to the date of mailing of the notice of intent to enter.

D. Any entry authorized by this section shall not be deemed a trespass. The natural gas company shall make reimbursement for any actual damages resulting from such entry. Nothing in this section shall impair or limit any right of a natural gas company obtained by (i) the power of eminent domain, (ii) any easement granted by the landowner or his predecessor in title, or (iii) any right-of-way agreement, lease or other agreement by and between a natural gas company and a landowner or their predecessors in title or interest.

Va. Code Ann. § 56-49.01.

Dominion attached a "Notice of Intent to Enter Property" to its June 2014 letter. (Dkt. No. 1, ¶ 22; Dkt. No. 1-1 at 2.) In the notice, Dominion explained that the survey process would consist of several steps. (Dkt. No. 1-1 at 1.) First, "a contract survey crew" would mark the anticipated right of way. (*Id.*) Then "[a] traditional survey crew" would locate the proposed route using "transits and other surveying equipment." (*Id.*) And finally, "technicians [would] study the proposed route for any historical or archeological significance, endangered species, soil types, and other similar conditions." (*Id.*)

"During this process," Dominion continued, "there [could] be very minor earth disturbance"—which would "be promptly refilled and repaired"—and the surveyors could have "to clear pathways through brush and other growth." (*Id.*) Dominion also stated that it would

reimburse plaintiffs for "any actual damage" that their properties sustained as a result of "the survey process in the unlikely event that damage occur[red]." (*Id.*) It further said that it intended to start "the surveys on [their] propert[ies] on or after July 11, 2014," and that the "process [would] take several weeks to complete." (*Id.*)

After receiving Dominion's June 2014 letter and notice, each plaintiff "explicitly den[ied] permission for Dominion to enter upon his or her private property." (Dkt. No. 1, ¶ 25; Dkt. No. 1-1 at 3, Exhibit B.) Dominion responded with another letter in August 2014, acknowledging plaintiffs' denial of its request for permission to enter their properties. (Dkt. No. 1, ¶ 25; Dkt. No. 1-1 at 3.) It stated, however, that it still intended to go forward with the surveys, though it would not enter plaintiffs' properties until it had a court order to do so. (Dkt. No. 1, ¶ 25; Dkt. No. 1-1 at 3.) It also said that it planned to begin the surveys "on or after August 21, 2014." (Dkt. No. 1-1 at 3.)

### D. Plaintiffs file suit to stop Dominion from entering their properties and conducting surveys for the pipeline project.

Seeking to prevent Dominion from entering their properties and conducting surveys for the pipeline project, plaintiffs filed this action under 42 U.S.C. § 1983 in September 2014, claiming that § 56-49.01, "both on its face and as applied," violates the U.S. and Virginia Constitutions, and is therefore void and unenforceable. (Dkt. No. 1 at 1–4, 13.)[3] In Counts I and II of their complaint, plaintiffs claim that the statute takes their property right to exclude for private use or without just compensation, in violation of the Fifth Amendment and Article I, § 11 of the Virginia Constitution. (*Id.* ¶¶ 26–36.) In Count III, they claim that the statute

---

[3] Today, the court decides another constitutional challenge to Virginia Code § 56–49.01 in *Little v. Dominion, Transmission, Inc.*, No. 5:14–cv–00060, slip op. at 1 (W.D. Va. Sept. 30, 2015). There, two landowners who, like plaintiffs here, received notices of intent to enter from Dominion filed suit, claiming that the statute is unconstitutionally vague and thus void. *Id.* at 2-5. The court disagrees and holds that the statute is not void for vagueness. It accordingly dismisses the landowners' complaint. *Id.* at 15.

5

unreasonably seizes their right to exclude, in violation of the Fourth Amendment. (*Id.* ¶¶ 37–41.) And in Count IV, they claim that the statute deprives them of their property right to exclude without due process, in violation of the Fourteenth Amendment. (*Id.* ¶¶ 42–46.)

Plaintiffs seek a declaration that the statute is void and unenforceable, an injunction prohibiting Dominion or any others acting on its behalf or in conjunction with it from entering their properties and conducting surveys under the statute, and an award of their attorney's fees and costs. (*Id.* at 4,13.)

### E. Dominion moves to dismiss plaintiffs' complaint, and the Commonwealth intervenes to defend the constitutionality of § 56-49.01.

In response to plaintiffs' complaint, Dominion filed this motion to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction and Rule 12(b)(6) for failure to state a claim upon which relief can be granted. (Dkt. No. 3, Mot. to Dismiss.) Pursuant to 28 U.S.C. § 2403(b), the Commonwealth has intervened to defend the constitutionality of § 56-49.01. (Dkt. No. 21, Mot. to Intervene.) It also advocates dismissal. (Dkt. No. 22 at 30, Intervenor's Mem. in Defense of Va. Code § 45–49.01.)

District Judge Michael F. Urbanski heard oral argument from the parties and the Commonwealth on February 5, 2015, and took the matter under advisement. (Dkt. No. 33 at 1, 107–08, Hr'g Tr.) On June 22, he transferred the case to the undersigned. (Dkt. No. 36, Order.) Shortly thereafter, the court offered the parties and the Commonwealth an opportunity to reargue their positions. They accepted the invitation, submitted supplemental memoranda, and presented additional oral argument on August 4.

### F. ACP assumes control of the pipeline project and is made a party defendant.

Following the transfer, the parties and the Commonwealth moved to add ACP as a party defendant. (Dkt. No. 38 at 1–2, Mot. to Allow Joinder of ACP.) Sometime after the plaintiffs

6

filed their complaint, ACP assumed responsibility of the pipeline project and sent notices to plaintiffs, telling them that it intended to enter their properties and conduct surveys, in accordance with § 56-49.01. (*Id.* at 1.) The parties and the Commonwealth thus agreed that ACP is a necessary party to this action under Federal Rule of Civil Procedure 19(a)(1)(B). (*Id.* at 2.)

The court granted the motion and added ACP as a party defendant. (Dkt. No. 39 at 1, Order.) It also ordered that ACP is deemed to have joined Dominion's motion to dismiss and its supporting memorandums, and that plaintiffs' opposition to the motion is deemed asserted against ACP. (*Id.*)

**G. ACP changes the proposed route of the pipeline.**

At the hearing on August 4, 2015, ACP informed the court that it has made a change to the proposed route of the pipeline and that it no longer runs through plaintiffs' properties. At this time, then, ACP has no intention of entering the properties and conducting surveys for the pipeline project. But it also stated that it cannot guarantee that it will not change the route back in the future.

II. MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION

Defendants first move to dismiss plaintiffs' complaint under Rule 12(b)(1) for lack of subject-matter jurisdiction. They contend that the court lacks subject-matter jurisdiction over plaintiffs' claims because they are not ripe. (Dkt. No. 4 at 17–23, Defs.' Mem. in Supp. of Mot. to Dismiss.) For its part, the Commonwealth maintains that plaintiffs' facial challenges to § 56-49.01 are ripe, but that their as-applied challenges are not. (Dkt. No. 22 at 38–39; Dkt. No. 41 at 13–15, Intervenor's Mem. in Resp. to Pls.' Suppl. Mem.)

7

The court agrees with the Commonwealth. It will thus grant defendants' Rule 12(b)(1) motion to dismiss in part and deny it in part, and dismiss plaintiffs' as-applied challenges without prejudice.

## A. Standard of Review

A motion to dismiss under Rule 12(b)(1) tests the court's subject-matter jurisdiction over the plaintiff's claim. The plaintiff bears the burden of establishing that subject-matter jurisdiction exists. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). In deciding a Rule 12(b)(1) motion to dismiss, "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). It must, however, "view[] the alleged facts in the light most favorable to the plaintiff, similar to an evaluation pursuant to Rule 12(b)(6)." *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999). Dismissal under Rule 12(b)(1) is proper "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans*, 166 F.3d at 647 (quoting *Richmond, Fredericksburg & Potomac R.R*, 945 F.2d at 768).

## B. Plaintiffs' claims are not moot.

Before turning to the ripeness of plaintiffs' claims, the court must first address whether ACP's subsequent change to the proposed route of the pipeline renders the claims moot. The parties and the Commonwealth submit that it does not, and the court agrees.

"Mootness is primarily a function of the Article III 'case or controversy' limitation on the jurisdiction of the Federal courts." *Am. Legion Post 7 v. City of Durham*, 239 F.3d 601, 605 (4th Cir 2001). A case becomes "moot when the issues presented are no longer 'live' or the parties

lack a legally cognizable interest in the outcome." *United States v. Springer*, 715 F.3d 535, 540 (4th Cir. 2013) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). Since the "'case-or-controversy requirement subsists through all stages of federal judicial proceedings, . . . it is not enough that a dispute was very much alive when suit was filed,' the parties must retain a concrete interest in the outcome of the litigation throughout all stages of the proceedings." *Id.* (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)).

The defendant's "voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Knox v. Service Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012). Hence, it is "well established" that voluntary cessation "moots an action only if 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

In this case, defendants and the Commonwealth do not contend that ACP's change to the proposed route of the pipeline moots plaintiffs' claims. And for good reason. ACP admits that it cannot guarantee that it will not change the route back across plaintiffs' properties in the future. It is therefore possible that the "allegedly wrongful behavior" here could recur. *Wall*, 741 F.3d at 497 (quoting *Laidlaw*, 528 U.S. at 189). For this reason, the court concludes that plaintiffs' claims are not moot.

## C. Plaintiffs' facial challenges are ripe, but their as-applied challenges are not.

Ripeness is a threshold question of justiciability drawn from both Article III limitations and prudential considerations. *Sansotta v. Town of Nags Head*, 724 F.3d 533, 545 (4th Cir. 2013). "The doctrine of ripeness prevents judicial consideration of issues until a controversy is

presented in clean-cut and concrete form." *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013) (quoting *Miller v. Brown*, 462 F.3d 312, 318–19 (4th Cir 2006)). Its purpose "is to require courts to avoid taking premature judicial action, thereby preventing them from becoming entangled in 'abstract disagreements.'" *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)). "The burden of proving ripeness falls on the party bringing suit." *Miller*, 462 F.3d at 319.

To determine ripeness, a court must "balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013). "A case is fit for adjudication 'when the action in controversy is final and not dependent on future uncertainties.'" *Scoggins*, 718 F.3d at 270 (quoting *Miller*, 462 F.3d at 319). In other words, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur at all." *Id.* (alteration in original) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). The hardship prong "is 'measured by the immediacy of the threat and the burden imposed on the [plaintiff] who would be compelled to act under threat of enforcement of the challenged law.'" *Doe*, 713 F.3d at 759 (quoting *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208–09 (4th Cir. 1992)).

### *(1) Plaintiffs' facial challenges are ripe.*

Plaintiffs' facial challenges are fit for judicial review at this time. "Such . . . challenges to regulation are generally ripe the moment the challenged regulation or ordinance is passed." *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 736 n.10 (1997); *see also Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) ("As this allegation does not depend on the extent to which petitioners are deprived of the economic use of their particular pieces of property or the extent to

which these particular petitioners are compensated, petitioners' facial challenge is ripe."). And the prudential ripeness requirements set forth in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 195 (1985), which are normally applicable to takings claims under the Fifth Amendment, do not apply to facial challenges to regulation. *Holliday Amusement Co. of Charleston, Inc. v. South Carolina*, 493 F.3d 404, 407 (4th Cir. 2007); *Beacon Hill Farm Assocs. II Ltd. P'ship v. Loudon Cnty. Bd. of Supervisors*, 875 F.2d 1081, 1084 (4th Cir. 1989). The court therefore concludes that plaintiffs' facial challenges are ripe.

### (2) Plaintiffs' as-applied challenges are not ripe.

Unlike their facial challenges, plaintiffs' as-applied challenges are not fit for judicial review at this time. Defendants have not entered plaintiffs' properties, and they have no intention of doing so now, given the change to the proposed route of the pipeline. Plaintiffs' as-applied challenges thus rest on "contingent future events that may not occur at all." *Scoggins*, 718 F.3d at 270 (quoting *Texas*, 523 U.S. at 300).[4]

Withholding judicial review of their as-applied challenges at this time will not cause plaintiffs undue hardship because they face no immediate threat of injury. As just noted, defendants have not entered plaintiffs' properties, and they have no current plans to do so. Moreover, if defendants change their mind at some point in the future, they have said that they will "obtain a court order before entering . . . [p]laintiffs' properties." (Dkt. No. 1, ¶ 25; *see also* Dkt. No. 1-1 at 3.)

Accordingly, the court concludes that plaintiffs' as-applied challenges are not ripe.

---

[4] Because plaintiffs' as-applied challenge under the Fifth Amendment does not satisfy general ripeness requirements, the court need not, and does not, address whether it meets the specific ripeness requirements set forth in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 195 (1985).

11

* * *

Because plaintiffs' facial challenges are ripe, but their as-applied challenges are not, the court will grant defendants Rule 12(b)(1) motion to dismiss in part and deny it in part, and dismiss the as-applied challenges without prejudice.

III. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Defendants also move to dismiss plaintiffs' complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. They and the Commonwealth argue that plaintiffs' facial challenges to § 56-49.01 fail because the statute does not deprive a landowner of a constitutionally protected property right. (Dkt. No. 16 at 8–15, Defs.' Reply Mem. in Supp. of Mot. to Dismiss; Dkt. No. 22 at 11–38.)

The court agrees. It will therefore grant defendants' 12(b)(6) motion to dismiss and dismiss plaintiffs' facial challenges with prejudice.

**A. Standard of Review**

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the plaintiff's complaint to determine whether the plaintiff has properly stated a claim. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To avoid dismissal, the "complaint must establish 'facial plausibility' by pleading 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 554 (4th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Basically, the plaintiff must "nudge [his] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In determining whether the plaintiff has met this plausibility standard, the court must take as true all well-pleaded facts in the complaint and in any documents incorporated into or attached

12

to the complaint. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Further, it must "draw[] all reasonable factual inferences from those facts in the plaintiff's favor," *Edwards*, 178 F.3d at 244, but it need not "accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

**B. Plaintiffs allege state action for purposes of their federal-law claims, and the court has supplemental jurisdiction over their state-law claim.**

Before turning to the plausibility of plaintiffs' individual facial challenges, the court must first address two threshold arguments that defendants make in support of their 12(b)(6) motion to dismiss. Both concern 42 U.S.C. § 1983, the statute upon which plaintiffs rely in bringing this action. (Dkt. No. 1, ¶ 1.)

Section 1983 "creates a private right of action to vindicate violations of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Rehberg v. Paulk*, 132 S. Ct. 1497, 1501 (2012). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

Defendants first argue that plaintiffs' claims fail because their allegations do not establish state action. (Dkt. No. 4 at 23–25.) Plaintiffs allege that § 56-49.01 allows a natural gas company to enter private property "solely for reasons of its own pecuniary self-interest" and "convenience." (Dkt. No. 1 at 2, ¶¶ 30, 40.) Taking this allegation as true, defendants contend, "[p]laintiffs claim that [defendants are] "not performing an 'exclusively public function'; they are merely acting in [their] corporate self-interest." (Dkt. No. 4 at 25.) Under plaintiffs' theory of the case, then, defendants are private, not state, actors for purposes of § 1983.

13

The court disagrees. Under the "public function" doctrine, a private entity becomes a state actor within the meaning of § 1983 when it exercises "powers traditionally exclusively reserved to the State." *Andrews v. Fed. Home Loan Bank*, 998 F.2d 214, 218 (4th Cir. 1993) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974)). Eminent domain is just such a power. *Jackson*, 419 U.S. at 353. And so when a private entity exercises eminent domain authority, it becomes a state actor within the meaning of § 1983. *Baldwin v. Appalachian Power Co.*, 556 F.2d 241, 242 (4th Cir. 1977).

Here, a natural gas company's right of entry under § 56-49.01 is part and parcel of its eminent domain authority. *See* Va. Code § 56-49.01(D). The right exists so that a natural gas company can determine whether property is suitable for a proposed pipeline before taking it by eminent domain. *See id.* § 56-49.01(A). Thus, when a natural gas company exercises the right, even for its own self-interest, it becomes a state actor for purposes of § 1983.

Because plaintiffs allege that defendants seek to enter their properties pursuant to the right of entry granted in § 56-49.01, the court concludes that plaintiffs' allegations establish that defendants are state actors under § 1983. It will therefore deny defendants' motion to dismiss plaintiffs' claims for failure to allege state action.

Defendants also argue that plaintiffs' claim for violation of Article I, § 11 of the Virginia Constitution fails because § 1983 does not create a cause of action for violations of state law. (Dkt. No. 4 at 33–34.) Though it is true that § 1983 "protect[s] only federal rights guaranteed by federal law," *Wright v. Collins*, 766 F.2d 841, 849 (1985), the court reads the claim not as a § 1983 claim, but as a state-law claim over which it has supplemental jurisdiction under 28 U.S.C. § 1367(a). The court will thus deny defendants' motion to dismiss the claim for failure to allege the violation of a federal right.

14

## C. Plaintiffs' facial challenges to § 56-49.01 fail.

"A facial challenge is an attack on a statute itself as opposed to a particular application." *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2449 (2015). Facial challenges are generally "disfavored," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008), and "the most difficult . . . to mount successfully," *Patel*, 135 S. Ct. at 2449 (omission in original) (quoting *United States v. Salerno*, 481 U. S. 739, 745 (1987)). To succeed in a facial challenge, the plaintiff must "'establish[] that no set of circumstances exists under which the [statute] would be valid,' *i.e.*, that the law is unconstitutional in all of its applications," *Wash. State Grange*, 552 U.S. at 449 (quoting *Solerno*, 481 U.S. at 745), "or that the statute lacks any 'plainly legitimate sweep,'" *United States v. Stevens*, 559 U.S. 460, 472 (2010) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 740 n.7 (1997)).

In determining whether a state statute is facially unconstitutional, a federal court "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange*, 552 U.S. at 449–50. It must also be mindful that "[a]ttendant to the enactments of a state legislature is a 'strong presumption of validity and constitutionality.'" *S.C. Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1256 (4th Cir. 1989) (quoting *Barwick v. Celotex Corp.*, 736 F.2d 946, 955 (4th Cir. 1984)).

Here, plaintiffs allege four separate facial challenges to § 56-49.01. None succeeds.

### (1) Section 56-49.01 is not facially unconstitutional under the Fifth Amendment.

In Count I of their complaint, plaintiffs allege that § 56-49.01 effects a taking of their property right to exclude without just compensation, in violation of the Fifth Amendment. (Dkt. No. 1, ¶¶ 26, 31.) Under the Takings Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, no "private property [shall] be taken for public use, without just compensation." U.S. Const. amend V.

15

Although the Takings Clause protects property rights, including the right to exclude, it does not itself create them; "such property interests 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *S.C. Educ. Assistance Auth. v. Cavazos*, 883 F.2d 1251, 1256 (4th Cir. 1990) (quoting *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1011 (1984)); *see also Washlefske v. Winston*, 234 F.3d 179, 183 (4th Cir. 2000) ("The Takings Clause *protects* private property; it does not create it."). To determine whether a landowner has a constitutionally protected property right to exclude an authorized utility from entering his property for survey purposes, then, the court must look outside the Takings Clause.

### a. The common law recognizes the privilege to enter for survey purposes.

There can be no doubt that the right to exclude is one of the essential sticks in the bundle of property rights. *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 82 (1980). But, as defendants and the Commonwealth maintain, it is not absolute. (Dkt. No. 22 at 13–21; Dkt. No. 42 at 4–5, Defs.' Reply in Opp'n to Pls.' Suppl. Mem.) Quite the contrary. The common law has long recognized exceptions to the right. Indeed, the original Restatement of Torts, in 1934, catalogued numerous common-law privileges to enter private property without trespass liability, including the privilege to enter for the purpose of averting a public disaster, the privilege to enter for the purpose of reclaiming goods, and the privilege to enter for the purpose of arresting a criminal. Restatement of Torts §§ 196, 198, 204 (1934) (reproduced in Dkt. No. 23-9 at 21, 33, 58–59, Ex. 9).

For this case, the most significant common-law privilege recorded in the Restatement is the privilege to enter for the purpose of performing or exercising a legislative duty or authority. *Id.* § 211 (Dkt. No. 23-9 at 82). This privilege, the Restatement notes, encompasses (among

16

other things) "an employee of a public utility . . . authorized to enter upon privately owned land for the purpose of making surveys preliminary to instituting a proceeding for taking by eminent domain." *Id.* § 211 cmt. c. (Dkt. No. 23-9 at 83). This and the many other common-law privileges collected in the Restatement were included in the Second Restatement, published in 1965. Restatement (Second) of Torts §§ 159, 191–211 (1965) (reproduced in Dkt No. 23-10 at 1–65, Ex. 10).

As defendants and the Commonwealth point out, the common-law privilege to enter for survey purposes before exercising eminent domain authority was recognized well before the original Restatement was published in 1934. (Dkt. No. 4 at 28; Dkt. No. 22 at 14–21.) In 1868, for instance, judge and professor Thomas Cooley discussed the privilege in terms of takings and tort law, in his popular treatise on constitutional limitations:

> No constitutional principle . . . is violated by a statute which allows private property to be entered upon and temporarily occupied for the purpose of a survey and other incipient proceedings, with a view to judging and determining whether the public needs require the appropriation or not, and, if so, what the proper location shall be; and the party acting under this statutory authority would neither be bound to make compensation for the temporary possession, nor be liable to action of trespass.

Thomas M. Cooley, *Constitutional Limitations* 560 (1868) (reproduced in Dkt. No. 23-7 at 3, Ex. 7). Twelve years later, Cooley added in his treatise on torts that "the statutes which permit lands to be taken for public purposes may provide for preliminary surveys, in order to determine the necessity of any particular appropriation, and in thus providing, they license an entry upon the lands for the purpose." Thomas M. Cooley, *Law of Torts* 368 (1880) (reproduced in Dkt. No. 23-8 at 4, Ex. 8).

**b. Courts recognize the common-law privilege to enter for survey purposes.**

Courts have also long recognized the common-law privilege to enter private property for survey purposes prior to exercising eminent domain authority. In 1830, for example, Justice Baldwin ruled that New Jersey could authorize a railroad company to enter and plant stakes on private property, to determine the most appropriate route for a new road between Philadelphia and New York. *Bonaparte v. Camden & Amboy R.R. Co.*, 3 F. Cas. 821, 829, 831 (C.C.D.N.J. 1830) (No. 1,617). He explained:

> An entry on private property for the sole purpose of making the necessary explorations for location, is not taking it, the right remains in the owner as fully as before; no permanent injury can be sustained, nothing is taken from him, nothing is given to the company. When nothing further is done, it is competent for the legislature to give this authority, without any obligation to compensate for a damage which must be trivial; if the company commit any wanton acts, or do any unnecessary damage, they are trespassers, otherwise they have full power to locate the road, and the law is their justification.

*Id.* at 831.

Similarly, in 1837, New York's highest court said, in *Bloodgood v. Mohawk & Hudson R.R. Co.*, 18 Wend. 9 (N.Y. 1837), that entering land "for the purpose of determining the most advantageous route, place or places, for the proper line, course, road and way . . . is not, in ordinary acceptation or legal contemplation, the taking of land; there is no exercise of conclusive control or authority over the soil," *id.* at 34. The court further noted that the "mere passing over for the purpose of examining and surveying the most feasible route for the road, and of the lands necessary to be taken, on which to construct the road, cannot be said to be taking the land thus examined and surveyed." *Id.*

Thirteen years later, Massachusetts's highest court, in *Winslow v. Gifford*, 60 Mass. (6 Cush.) 327 (1850), found no constitutional infirmity in a state statute that allowed commissioners

18

to enter on private property for survey purposes, citing the common-law privilege, *id.* at 330.

The court reasoned:

> This exercise of power, in its various forms, is one of every day's occurrence; indeed, so common, as to be acquiesced in without remonstrance, or even a question as to the right so to do. Take the ordinary case of an officer required to arrest an individual on civil or criminal process, where the party to be arrested is found to be on the lands of his neighbor, and the officer enters upon such land to make the arrest. Is the sheriff guilty of trespass? Why not? The land of an individual has been entered upon without compensation. So, also, the case of legislative committees sent out to explore and report upon the expediency of a proposed railroad or canal; or of county commissioners called out to view and adjudicate upon a petition for a new highway, passing over land of individuals, not finally taken as a part of the highway; or, in a case, as it may be, in which, after minute examination and survey, the petition for a new highway is wholly rejected. In all these cases, the right to enter upon the lands of individuals, without making compensation therefor, has always been exercised, and no doubt has been entertained of their right as public servants, in the discharge of public duties, thus to pass over the lands of individuals, so far as may be necessary to discharge properly such duty as is required in the cases supposed.

*Id.* The Supreme Court of the United States cited *Winslow* and its discussion of the common-law privilege with approval in *Montana Co. v. St. Louis Mining & Milling Co.*, 152 U.S. 160, 167–68 (1894), in upholding a Montana statute that authorized a court to order a physical inspection of a mine to determine conflicting claims, *id.* at 165–66, 172.

### c. Every other state has codified, and courts have upheld, the common-law privilege to enter for survey purposes.

Every other state today has codified the common-law privilege to enter private property for survey purposes prior to exercising eminent domain authority. (*See* Dkt. No 22-1 at 1–16, Ex. 1 (collecting statutes).) And legal challenges to the validity of such statutes on the basis that they effect a taking without just compensation have been consistently rejected. *See* Peter G. Guthrie, *Eminent Domain: Right to Enter Land for Preliminary Survey or Examination*, 29 A.L.R. 3d 1104 (1970 & Supp. 2014) (collecting cases). (*See also* Dkt. No. 22-2 at 1–3, Ex. 2

19

(collecting cases from 26 states).)  Indeed, it appears that no court has declared a statute expressly giving a utility the right to enter private property for survey purposes before exercising eminent domain authority facially unconstitutional.

### d. Virginia law is in accord with the common law.

Consistent with the common law, Virginia has long permitted governmental entities and authorized utilities to conduct surveys on private property before exercising eminent domain authority.  For instance, the Code of 1819 gave a turnpike company "full power and authority to enter upon all lands and tenements through which they may judge it necessary to make said road; and to lay out the same according to their pleasure," provided no "dwelling-house, garden nor curtilage of any person be invaded without his consent."  2 Va. Rev. Code ch. 234, § 7 (1819) (reproduced in Dkt. No. 23-2, at 3, Ex. 2).  Likewise, the Code of 1860 gave an "internal improvement" company the authority to "enter upon any lands for the purpose of examining the same and surveying and laying out such as may seem fit to any officer or agent authorized by it, provided no injury be done to the owner or possessor of land."  Va. Code tit. 17, ch. 56 § 4 (1860) (reproduced in Dkt. No. 23-3 at 3, Ex. 3).  The Code of 1904 extended this authority to "[a]ny company" vested with eminent domain authority,  Va. Code § 1105f(3) (1904) (reproduced in Dkt. No. 23-4 at 2. Ex, 4), and it was restated in the Code of 1930, Va. Code § 3866(a) (1930) (reproduced in Dkt. 23-5 at 2, Ex. 5), and the Code of 1946., Va. Code § 3866(a) (1946 Cum. Supp.) (reproduced in Dkt. No. 23-5 at 3, Ex. 6).  Today, the Code contains three entry-for-survey statutes, including § 56-049.01.  Va. Code § 25.1-203; *id.* § 56-49; *id.* § 56-049.01.

The Supreme Court of Virginia has also long recognized exceptions to a landowner's right to exclude.  In 1905, for example, it held that, without actual damage, one railroad company

was not entitled to an injunction prohibiting another railroad company from entering its property and conducting surveys for a new line before exercising eminent domain authority. *S. & W. Ry. Co. v. Va. & S.W. Ry. Co.*, 51 S.E. 843, 844–45 (Va. 1905). The court explained that the railroad seeking the injunction had failed to allege "physical injury or damage to the substance of [its] property, nor any physical obstruction or interference by the [other railroad] in the prosecution of the work," and that right "to condemn any part of the land in controversy [could] be determined in the [subsequent] condemnation proceedings." *Id.*

From the extensive authorities discussed above, which plaintiffs do not rebut, it is clear that the common law recognizes, and state and federal courts have consistently upheld, the privilege to enter private property for survey purposes before exercising eminent domain authority and that Virginia law is fully in accord with the common law. The court therefore concludes that a landowner has no constitutionally protected property right to exclude an authorized utility from entering his property for survey purposes. Without such a right, then, plaintiffs fail to allege a plausible facial challenge under the Takings Clause. *See Washlefske*, 234 F.3d at 185–86.

### e. Even assuming a right to exclude here, § 56-49.01 does not effect a compensable taking of that right.

Even assuming the existence of a right to exclude here, the court would still conclude that § 56-49.01 is facially constitutional under the Takings Clause because it does not effect a compensable taking of that right. The Supreme Court has developed no "set formula" for determining when a government regulation requires compensation under the Takings Clause. *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). Instead, it has established "an 'ad hoc' factual inquiry," requiring the consideration of "factors such as the economic

21

impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2427 (2015).

In spite of this case-by-case approach, the Supreme Court has recognized a few cases of *per se* takings. One such case is where a regulation "permanently requires a property owner to sacrifice all economically beneficial uses of his or her land." *Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 518 (2012). Another is where a regulation requires a property owner to suffer a "permanent physical occupation" of his or her property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441 (1982).

"Not every physical *invasion* is a taking," however. *Id.* at 436 n.12. The Supreme Court has recognized that there is "constitutional distinction between a permanent occupation and a temporary physical invasion." *Id.* at 434. While "permanence and absolute exclusivity of a physical occupation" always give rise to a compensable taking, "temporary limitations on the right to exclude" do not. *Id.* at 436 n.12.

*PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), offers an example of a limitation on the right to exclude that does not rise to a compensable taking. There, a California law required a shopping mall to allow members of the public to leaflet on its property. *Id.* at 76–79. The shopping mall claimed that the law effected a taking of its right to exclude without just compensation, in violation of the Takings Clause. *Id.* at 82. The Supreme Court disagreed. *Id.* at 85. While the Court acknowledged that the shopping mall had a right to exclude and that the law had "literally" taken that right, it nevertheless held that there had "clearly" been no compensable taking. *Id.* at 83. The Court explained that the law would not "unreasonably impair the value or use of [the shopping mall's] property as a shopping center" and that the mall could take measures to "minimize any interference with its commercial functions." *Id.*

22

Here, § 56-49.01 is even less intrusive than the California law at issue in *PruneYard*. As opposed to compelling a landowner to open his property to the public at large for indefinite periods, the statute authorizes only the temporary presence of surveyors for a natural gas company. What's more, the statute minimizes the surveyors' intrusion, prohibiting their use of motor vehicles and power equipment on the property without the landowner's permission. Va. Code § 56-49.01(A). The statute also requires a natural gas company to reimburse the landowner for any damage caused by the surveyors. *Id.* § 56-49.01(D).

Plaintiffs attempt to distinguish *PruneYard*, arguing that, unlike a shopping mall, their properties are used as personal residences and that consequently their reasonable investment-backed expectations are not comparable with those of an owner of "a shopping mall, which exists solely for repeated entry by the public." (Dkt. No. 7 at 30.) That is true enough, but it does not take away from the Supreme Court's holding that a temporary, nonexclusive physical invasion that does not unreasonably impair a property's value or use is not a compensable taking. Here, plaintiffs make no allegations establishing that § 56-49.01 unreasonably impairs the value or use of their properties. On the contrary, they concede that it "has likely not reduced the value of [their] propert[ies]." (Dkt. No. 7 at 19.)

But even assuming that § 56-49.01 unreasonably impairs the value or use of their properties, plaintiffs must show that it does so for every other parcel of property, in order to prevail on their facial challenge. *See Wash. State Grange*, 552 U.S. at 449. Plaintiffs' allegations, of course, establish no such thing—nor could they. On its face, the statute applies to residential and commercial properties alike. And *PruneYard* shows that a temporary, nonexclusive physical invasion does not unreasonably impair the reasonable investment-backed expectations of the owner of a parcel of commercial property.

23

As the defendants and the Commonwealth contend, the temporary and minimally intrusive nature of the entry authorized under § 56-49.01 also distinguishes this case from *Kaiser Aetna v. United States*, 444 U.S. 164 (1979), and *United States v. Causby*, 328 U.S. 256 (1946), two cases upon which plaintiffs principally rely to support their Fifth Amendment claim.  In *Kaiser Aetna*, a property owner in Hawaii wanted to turn its pond into a marina.  *Id.* at 166.  Thus, with the permission of the Army Corps of Engineers, the owner dug a channel from the pond to the ocean, thereby connecting the two bodies of water.  *Id.* at 167–68.  The owner intended to charge people to use the marina, but the Corps had other ideas.  *Id.* at 168.  It told the owner that the marina was now a part of the United States' navigable waters and, as a result, must be made available to the public, without charge.  *Id.*  The owner, of course, did not like this and so it sued the United States, arguing that the Corps's order had effected a taking without just compensation.  *Id.* at 168–69.

The Supreme Court agreed.  It first concluded that "the right to exclude, so universally held to be a fundamental element of the property right, [cannot be] tak[en] without compensation."  *Id.* at 179–80.  It then held that the Corps's imposition of a navigational servitude on the owner had effected a taking because it would "result in an actual physical invasion of the privately owned marina."  *Id.* at 180.  "[E]ven if the Government physically invades only an easement in property," the Court explained, "it must nonetheless pay just compensation."  *Id.*

This case is unlike *Kaiser Aetna* in many respects.  To start with, as noted above, the access permitted under § 56-49.01 is temporary, not permanent, and it is limited to natural gas companies for the sole purpose of conducting surveys before exercising eminent domain authority.  Further, as plaintiffs concede, the statute "has likely not reduced the value of [their]

24

propert[ies]." (Dkt. No. 7 at 19.)  Given these differences, this case is readily distinguishable from *Kaiser Aetna*.

Plaintiffs' reliance on *Causby* fares no better.  There, the owners of a chicken farm near a local airport sued the government, claiming that its use of the airport for heavy bombers and fighter jets effected a taking of their property within the meaning of the Fifth Amendment. *Causby*, 328 U.S. at 258–59.  The planes flew so close to the owners' property that they would "blow the old leaves off" the trees and cause both "startling noise" and a glare that lit "up the place" at night.  *Id.* at 259.  Because of the noise, the owners lost roughly 150 chickens and ultimately "had to give up their chicken business."  *Id.*  In light of this total "destruction of the use of the [owners'] property as a commercial chicken farm," the Supreme Court concluded that a compensable taking had occurred, reasoning that the government's invasion of the airspace had destroyed the property's use.  *Id.* at 259, 266–67.

Here, by contrast, plaintiffs allege no such destruction.  Indeed, as noted above, they admit that § 56-49.01 "has likely not reduced the value of [their] propert[ies]."  (Dkt. No. 7 at 19.)  But even if the temporary presence of surveyors on a landowner's property resulted in some destruction, the statute requires the natural gas company to reimburse the owner for that damage.  This case is thus easily distinguishable from *Causby*.

### f.   Section § 56-49.01 is for public use.

Even if defendants' entry onto their properties would be "temporary and de minimis" under § 56-49.01, plaintiffs submit that it would nevertheless be unconstitutional because it would not be "for public use" within the meaning of the Takings Clause.  (Dkt. No. 7 at 31–33.) This is so, plaintiffs contend, because defendants have not yet received a certificate of public

convenience and necessity for the proposed pipeline, which, in their view, "is a prerequisite to finding a public use." (*Id.*) The court disagrees.

To determine whether the Takings Clause's public-use requirement has been met, the Supreme Court has held that the taking need only serve a "public purpose." *Kelo v. City of New London*, 545 U.S. 469, 479–80 (2005). "Without exception," the Court has "defined that concept broadly, reflecting [its] longstanding policy of deference to legislative judgments in this field." *Id.* at 480.

In the Natural Gas Act, Congress "declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest." 15 U.S.C. § 717(a). Before a natural gas company can build a new pipeline, it must first obtain a certificate of public convenience and necessity from the Federal Energy Regulatory Commission. *Id.* § 717f(c)(1)(A). To obtain this certificate, the company must provide the Commission with certain information about the proposed route, including any "old-growth forest, . . . Native American religious sites[,] and traditional cultural properties to the extent they are known to the public at large." 18 C.F.R. § 380.12(j)(4).

Section 56-49.01 allows a natural gas company to gather this and other information required for the certificate by giving it the ability to enter property and conduct a minimally invasive survey. The statute thus facilitates the "transportat[ion] and selling" of natural gas, and thereby serves a public purpose.

Accordingly, § 56-49.01 satisfies the Takings Clause's public-use requirement.

### g.   Entry-for-survey statutes do not require utilities to buy a "pig in a poke."

Plaintiffs further argue that this case is different from all the rest that have upheld an authorized utility's right to enter for survey purposes prior to exercising eminent domain

26

authority because there are no pending or contemplated condemnation proceedings here. They submit that the authorities cited by defendants and the Commonwealth stand only for the proposition that "a preliminary entry is not a separately compensable taking that necessitates a separate condemnation proceeding," not that such an entry is not a taking. (Dkt. No. 40 at 6 (emphasis deleted).)

To support this argument, plaintiffs cite only one case—*Oglethorpe Power Corp. v. Goss*, 322 S.E.2d 887 (Ga. 1985). That case holds, however, that "a prospective condemnor is *not* required to adhere to condemnation procedures and constitutional provisions for compensation before making a preliminary entry, although it is . . . responsible for all damages which occur during its preliminary entry." *Id.* at 890 (emphasis added).

This rule makes good sense and is entirely consistent with the scheme established in § 56-49.01. For if plaintiffs were correct that an authorized utility may exercise its right to enter for survey purposes only if it has commenced condemnation proceedings or will do so after the survey, then the whole purpose of entry-for-survey statutes would be defeated. As an Indiana appellate court has explained:

> Properly exercised the pre-condemnation survey can serve the interests of both landowner and public utility. The landowner will have only so much of his land condemned as is needed for the particular utility purpose involved; and, the utility will not be forced to engage in the wasteful expenditure of the ratepayer's money by blindly purchasing a "pig in a poke."

*Ind. & Mich. Elec. Co. v. Stevenson*, 363 N.E.2d 1254, 1259 (Ind. Ct. App. 1977). The court accordingly finds plaintiffs' argument here not only unsupported, but also unconvincing.

\* \* \*

In sum, the court concludes that a landowner does not have a constitutionally protected property right to exclude an authorized utility from entering his property for survey purposes and

27

that, even if he did, § 56-49.01, on its face, does not effect a compensable taking of that right. The court thus holds that plaintiffs fail to allege a facial challenge to the statute under the Takings Clause.

### (2) Section 56-49.01 is not facially unconstitutional under the Virginia Constitution.

In Count II of their complaint, plaintiffs allege that § 56-49.01 violates Article I, § 11 of the Virginia Constitution because "it permits the taking of [their] property for purely private benefit . . . and prior to the receipt of a [certificate of public convenience and necessity], and even if the invasion is for public use[,] it purports to permit such taking while eliminating any right to compensation for the invasion itself."  (Dkt. No. 1, ¶ 36.)  Article I, § 11 in relevant part provides:

> That the General Assembly shall pass no law whereby private property, the right to which is fundamental, shall be damaged or taken except for public use.  No private property shall be damaged or taken for public use without just compensation to the owner thereof.  No more private property may be taken than necessary to achieve the stated public use. Just compensation shall be no less than the value of the property taken, lost profits and lost access, and damages to the residue caused by the taking. . . .  A public service company, public service corporation, or railroad exercises the power of eminent domain for public use when such exercise is for the authorized provision of utility, common carrier, or railroad services.  In all other cases, a taking or damaging of private property is not for public use if the primary use is for private gain, private benefit, private enterprise, increasing jobs, increasing tax revenue, or economic development, except for the elimination of a public nuisance existing on the property.

Va. Const. Art. 1, § 11.

For the same reasons that plaintiffs fail to allege a plausible facial challenge under the Takings Clause, they fail to allege a plausible facial challenge under Article I, § 11.  As the Commonwealth points out, the Supreme Court of Virginia has often followed the Supreme Court of the United States in determining whether a taking has occurred under Article I, § 11.  *See, e.g.*, *Lee v. City of Norfolk*, 706 S.E.2d 330, 338 (Va. 2011) (citing with approval *Keystone*

Case 3:14-cv-00041-EKD-JCH   Document 47   Filed 09/30/15   Page 28 of 35   Pageid#: 1019

*Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 492 (1987), in observing that "[t]he law is well settled that the abatement of a nuisance by a public body is not a compensable taking"); *Richmond, Fredericksburg & Potomac R.R. Co. v. Metro. Wash. Airports Auth.*, 468 S.E.2d 90, 97 (Va. 1996) (quoting with approval *United States v. Causby*, 328 U.S. 256, 266 (1946), in concluding that an airport authority had not taken the landowner's property by "'using' it for overflights or a runway protection zone"). Further, as discussed above, the Virginia Supreme Court held more than 100 years ago that one railroad could not enjoin another from entering its property for survey purposes before exercising eminent domain authority. *S. & W. Ry. Co.*, 51 S.E. at 844–45. In light of these precedents, the court can think of no reason why § 56-49.01 would be facially unconstitutional under Article I, § 11 when it is not so under the Takings Clause—and plaintiffs offer none.

The long history of entry-for-survey statutes in Virginia further convinces the court of § 56-49.01's facial constitutionality under Article I, § 11. As explained above, entry-for-survey statutes have existed in Virginia for well over a century, before and after Virginia's adoption of a takings clause, and it does not appear that their constitutionality has ever seriously been questioned. And plaintiffs' allegations provide no compelling reason for the court to start doing so now.

The court therefore concludes that plaintiffs fail to allege a plausible facial challenge under Article I, § 11.

### (3) Section 56-49.01 is not facially unconstitutional under the Fourth Amendment.

In Count III of their complaint, plaintiffs allege that § 56-49.01 unreasonably seizes their right to exclude, in violation of the Fourth Amendment. (Dkt. No. 1, ¶¶ 38–41.) That Amendment, made applicable to the States through the Fourteenth Amendment, provides in

29

relevant part that the people are "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

"The Fourth Amendment's protections against unreasonable seizures extend to real property." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). Those protections are, however, limited to the home and its curtilage or the area "immediately surrounding and associated with the home." *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). Hence, "[t]he Government's physical intrusion on such an area [as an open field] is of no Fourth Amendment significance." *United States v. Jones*, 132 S. Ct. 945, 953 (2012). A "seizure" of property within the meaning of the Fourth Amendment occurs when a state actor meaningfully interferes "with an individual's possessory interests in that property." *Presley*, 464 F.3d at 487 (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

Here, plaintiffs fail to allege sufficient facts to state a plausible facial challenge to § 56-49.01 under the Fourth Amendment. For starters, they do not allege sufficient facts to show any meaningful interference with a possessory interest. As discussed above, a landowner does not have a property right to exclude an authorized utility from entering his property for survey purposes.

Moreover, even assuming such a meaningful interference here, plaintiffs fail to allege sufficient facts to establish the application of the Fourth Amendment to their own properties, much less to every other landowner's property, as they must do to prevail on a facial challenge. *See Wash. State Grange*, 552 U.S. at 449. Each plaintiff owns tens of acres, which consist of mostly cleared fields and woodlands. (Dkt. No. 1, ¶¶ 8–9, 11–13, 15–16.) The Fourth Amendment offers no protection for these areas of plaintiffs' properties. As the Supreme Court

has explained, the "open fields" doctrine encompasses "any unoccupied or undeveloped area outside of the curtilage," including "thickly wooded" areas. *Oliver*, 466 U.S. at 181 n.11.

The expansiveness of plaintiffs' properties is what easily distinguishes this case from *Presley*, upon which plaintiffs heavily rely to support their Fourth Amendment claim. In that case, the plaintiff lived on a parcel that "encompass[ed] less than an acre of land along the Rivanna River." *Presley*, 464 F.3d at 482. The city knowingly publicized a map that displayed a nonexistent public easement across her property. *Id.* "Relying on this map, members of the public began travelling across [the plaintiff's] property, leaving behind trash, damaging the vegetation, and sometimes even setting up overnight camp sites." *Id.* Instead of trying to correct the erroneous map, the city asked the plaintiff for an easement and, when she refused, brought a criminal prosecution against her for taking various measures, including the installation of a fence, to protect her property. *Id.* at 483.

The plaintiff sued the City and the publisher of the map, alleging that they had (among other things) seized her property, in violation of the Fourth Amendment. *Id.* at 483. The district court dismissed the claim on the defendants' Rule 12(b)(6) motion to dismiss, but the Fourth Circuit reversed, holding that the plaintiff had stated a valid Fourth Amendment claim. *Id.* at 487–89. In doing so, however, the court assumed that the seizure occurred within the curtilage of the plaintiff's home because "[t]he Defendants ha[d] not contended that the property allegedly seized—a trail through [the plaintiff's] less-than-one-acre yard—extend[ed] beyond the curtilage, and the facts as alleged in [her] complaint provide[d] no basis for so concluding." *Id.* at 484 n.3.

Plaintiffs' complaint in this case does not allow the court to draw a similar inference. As alleged, plaintiffs own parcels totaling approximately 196 acres, 30 acres, and 101 acres,

respectively, which consist of mostly clear field and woodlands. (Dkt. No. 1, ¶¶ 8–9, 11–13, 15–16.) Even viewing these facts in the light most favorable to the plaintiffs, the court has no basis for concluding that the alleged seizure of their right to exclude has occurred within the curtilage of their homes.

And lastly, even if plaintiffs had alleged sufficient facts to show the application of the Fourth Amendment and a meaningful interference of a possessory interest here, their claim would still fail because § 56-49.01, on its face, does not amount to an unreasonable seizure, triggering the warrant requirement. The Fourth Amendment "does not proscribe all . . . seizures, but only those that are unreasonable." *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 619 (1989). "What is reasonable . . . 'depends on all of the circumstances surrounding the . . . seizure and the nature of the . . . seizure itself.'" *Id.* at 619 (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985)) "[N]either a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989). Rather, the reasonableness determination "reflect[s] a 'careful balancing of governmental and private interests.'" *Soldal v. Cook Cnty.*, 506 U.S. 56, 71 (1992) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985)). When, as here, the government does not act "to serve the ordinary needs of law enforcement," the balancing of these interests is done "without reference to [the] usual presumption in favor of the procedures specified in the [Fourth Amendment's] Warrant Clause." *Von Raab*, 489 U.S. at 679.

In this case, the governmental interests clearly outweigh the private interests. While the plaintiffs certainly have an interest in excluding others from their properties, that interest is outweighed by the interest the Commonwealth has in facilitating the supply of natural gas. And,

on its face, § 56-49.01 goes no further than is necessary to advance that interest, permitting only a minimally intrusive entry. First, it allows a natural gas company to enter only if "necessary (i) to satisfy any regulatory requirements and (ii) for the selection of the most advantageous location or route, the improvement or straightening of its line or works, changes of location or construction, or providing additional facilities." Va. Code Ann. § 56-49.01(A). Second, it requires the company to request permission and give notice before entering. *Id.* Third, it limits the company's entry to "examinations, tests, hand auger borings, appraisals, and surveys." *Id.* Fourth, it prohibits the use of motor vehicles and power equipment unless the company obtains prior consent. *Id.* And finally, it obliges the company to pay for any "actual damages" caused by its entry. *Id.* § 56-49.01(D).

For these reasons, the court concludes that plaintiffs fail to allege a plausible facial challenge to § 56-49.01 under the Fourth Amendment.

**(4)  *Section 56-49.01 is not facially unconstitutional under the Fourteenth Amendment.***

Finally, in Count IV of their complaint, plaintiffs allege that § 56-49.01 deprives them of their right to exclude without due process, in violation of the Due Process Clause of the Fourteenth Amendment, because it "provides no pre-deprivation opportunity to be heard," and because it provides no post-deprivation remedy." (Dkt. No. 1, ¶¶ 44–46.) Under that Clause, no "State [shall] deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

"Procedural due process simply ensures a fair process before the government may deprive a person of life, liberty, or property." *Sansotta*, 724 F.3d at 540 (quoting *Wolf v. Fauquier Cnty. Bd. of Supervisors*, 555 F.3d 311, 323 (4th Cir. 2009)). To state a procedural due process claim, a plaintiff must allege that (1) "he had a constitutionally cognizable life, liberty, or

property interest," (2) that "some form of state action" deprived him of that interest; and (3) "that the procedures employed were constitutionally inadequate." *Id.* (internal quotation marks and citations).

Here, plaintiffs fail to allege sufficient facts to establish a plausible facial challenge to § 56-49.01 under the Due Process Clause. To begin with, they do not allege a constitutionally cognizable property interest. As explained above, a landowner does not have a property right to exclude an authorized utility from entering his property for survey purposes.

Further, even assuming the existence and deprivation of such a property interest here, the Supreme Court has long held that the right to exclude is not absolute and so states may regulate it without violating the Due Process Clause. That was the case in *PruneYard*, 447 U.S. at 84–85. There, as discussed above, California law compelled a shopping mall owner to allow leafleting on its property, even though it had a recognized right to exclude. *Id* at 77–83. The shopping mall challenged the law, contending that it violated not only the Takings Clause, but also the Due Process Clause. *Id.* at 82–85.

The Supreme Court rejected the shopping mall's due process claim. It first explained that a state may "regulate [property rights] in the common interest" and that the "guaranty of due process, as has often been held, demands only that the law not be unreasonable, arbitrary or capricious, and the means selected shall have a real and substantial relation to the objective sought to be attained." *Id.* at 85 (quoting *Nebbia v. New York*, 291 U.S. 502, 525 (1934)). It then held that this test had been met "by the State's asserted interest in promoting more expansive rights of free speech and petition than conferred by the Federal Constitution." *Id.*

Here, as the Commonwealth submits, it can hardly be said that § 56-49.01 is unreasonable, arbitrary, or capricious, or that the means selected are unrelated to the objective

sought to be attained. On the contrary, the statute serves a legitimate state interest in facilitating

the supply of natural gas, and it gives a natural gas company only a limited right of entry in

furtherance of that interest.

Moreover, Virginia law provides constitutionally adequate procedures. Section 56-49.01

itself requires a natural gas company not only to give advance notice before entering property,

but also to request the landowner's written permission to enter. Va. Code § 56-49.01(A). It

further requires a natural gas company to reimburse a landowner for any damages caused by its

entry. *Id.* § 56-49.01(D).

The court accordingly concludes that plaintiffs fail to allege a plausible facial challenge

to § 56-49.01 under the Due Process Clause.

## IV. CONCLUSION

For the foregoing reasons, the court concludes that plaintiffs' facial challenges to

Virginia Code § 56-49.01 fail because the statute does not deprive a landowner of a

constitutionally protected property right, and that plaintiffs' as-applied challenges fail because

they are not ripe. The court will therefore grant defendants' motion and dismiss plaintiffs'

complaint.

An appropriate order will follow.

Entered: September 30, 2015.

*Elizabeth K. Dillon*
United States District Judge

35